UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

AMY ADAMS, FRANK ADAMS, SCOTT ADAMS,
ADMINISTRATORS FOR THE PROFESSIONS,
INC. DEFINED BENEFIT PENSION PLAN, JOSEPH
J. ANANIA, JR. and JANICE M. ANANIA,
WILLIAM ANNECHINI and CLAIRE ANNECHINI,
VERONICA BEKKEDAM, BELK FOUNDATION,
BENEDICT FOUNDATION,  PETER B. BENEDICT
as TRUSTEE OF THE PETER B. BENEDICT
REVOCABLE TRUST, PETER B. BENEDICT II,
ANTHONY J. BONOMO and MARY ELLEN
BONOMO, HARRY J. BOOTH and ANTOINETTE C.
BOOTH, HUGH T. BRENNAN, C. ED CARLISLE,
CARMEN CARUSO, FRED DAVIS AND PAT
DAVIS, EUGENE J. DOWD, JR., CHARLES
FARRELL and RUTH FARRELL, DR. HERBERT
FEINBERG, STEVEN FINK, BRIAN GRADEN,
JUDD KLEMENT and AMY ROWE KLEMENT,
THE MCFADZEAN 1998 TRUST, ARLA J. MERTZ
as TRUSTEE OF THE ARLA J. MERTZ
REVOCABLE TRUST, BARBARA D. MITCHELL as
TRUSTEE OF THE TRUST U/W JAMES H.
MITCHELL FBO BARBARA D. MITCHELL,
PAULINE MONSON, NANCY L. PALEY, DANIEL
RADOMSKI, FREDERICK ROSEN, LAWRENCE
ROVIN, RICHARD RUCH JR., IVAN SCHARER,
JAY SCHARER, D.V.F.G. - TOM SCHIRMER,
MICHAEL SELVERNE, SERAVALLI FINANCIAL
GROUP INC. PROFIT SHAING PLAN AND TRUST,
SERAVALLI, INC., MARC SMITH,  WILLIAM
SPINK, DUCE STALEY, EILEEN TAYLOR,
DONALD TRAVIS,  KIM TUSKI as TRUSTEE OF
SPECIAL NEEDS TRUST FBO JOSEPH TUSKI,
BRENT WARE and JUDY WARE, SCOT WARE,
WHITE OAK GLOBAL ADVISORS, LLC, NICK
WORONTZOFF, and DEBRA ZUCCARINI,

CASE NO. _____

        Plaintiffs,

v.

SCOTT W. ROTHSTEIN, TD BANK, N.A.  and
GIBRALTAR PRIVATE BANK AND TRUST
COMPANY,

        Defendants.

## COMPLAINT

The above-captioned Plaintiffs, bring this Complaint against Defendants SCOTT W. ROTHSTEIN ("Rothstein"), TD BANK, N.A. ("TD Bank") and GIBRALTAR PRIVATE BANK AND TRUST COMPANY ("Gibraltar") and allege as follows:

## INTRODUCTION

1.     The fifty seven (57) named Plaintiffs comprise one of the largest known groups of victims of Rothstein's notorious and widely publicized $1.2 billion Ponzi scheme, collectively losing nearly $40 million in the so-called Banyon Income Funds (the "Banyon Funds").

2.     Rothstein has admitted to perpetuating one of the largest fraudulent schemes in history.  He has pled guilty to five felonies and is currently serving a fifty (50) year sentence in federal prison.  Rothstein's Ponzi scheme and ensuing losses to scores of individual investors occurred through the assistance of Rothstein's bankers, Defendants TD Bank and Gibraltar, both of whom played critical roles in selling and facilitating Rothstein's structured settlement scheme to unwitting investors.

3.     As detailed below, TD Bank aided and abetted Rothstein's scheme by deliberately ignoring banking laws designed specifically to protect the public from money laundering, fraud and Ponzi schemes.  TD Bank also provided, including to Plaintiffs, false bank and financial records to lend credibility to Rothstein's scheme and to induce their investment.  Indeed, TD Bank vouched for the validity of bogus settlement accounts to the managing agents of the Banyon Funds and/or their investment advisor.

4.     In return for facilitating the Rothstein scheme, TD Bank received significant new business from Rothstein and his associates and co-conspirators, cycling hundreds of millions of dollars (of investors' funds) through Rothstein's law firm, Rothstein, Rosenfeldt & Adler

("RRA"), client trust accounts and other slush fund accounts. TD Bank employees also received lavish gifts, including cash bribes, from Rothstein.

5.      In the aftermath of the scheme's collapse, TD Bank employees have asserted their Fifth Amendment rights to avoid answering questions concerning their involvement in Rothstein's fraud even while Rothstein's accomplices at RRA continue to plead guilty.

6.      For its part, Gibraltar provided Rothstein substantial credit extensions totaling more than $64 million over approximately two years, to allow Rothstein to sustain the Ponzi scheme. Gibraltar also deviated from and intentionally ignored internal anti-money laundering controls to accommodate Rothstein's demands. Executives at Gibraltar advised Rothstein about how to skirt red flags that would garner the attention of federal banking oversight agencies. Finally, Gibraltar allowed Rothstein to transfer millions of dollars among client trust funds, business and personal accounts at will. In return, Gibraltar and certain of its senior executives received large transaction fees, commissions and even personal "gifts" from Rothstein to the tune of hundreds of thousands of dollars.

7.      In short, both banks (institutionally and through their employees) had actual knowledge and/or at minimum constructive knowledge of, and provided substantial assistance to, Rothstein's Ponzi scheme. As such, they (along with Rothstein) are jointly and severally liable to Plaintiffs for the full amount of their damages.

**PARTIES**

8.      Plaintiff Amy Adams is an individual who resides in Charlotte, North Carolina.

9.      Plaintiff Frank Adams is an individual who resides in Hilton Head, South Carolina.

10.      Plaintiff Scott Adams is an individual who resides in Charlotte, North Carolina.

3

11. Plaintiff, The Trustees of the Administrators for the Professions, Inc. Defined Benefit Pension Plan, sue on behalf of the Administrators for the Professions, Inc. Defined Benefit Pension Plan ("AFPDBPP") an employee retirement plan sponsored by Administrators for the Professions, Inc., a corporation organized under the laws of New York with its principal place of business in Roslyn, New York.

12. Plaintiff Joseph J. Anania, Jr. is an individual who resides in Colts Neck, New Jersey.

13. Plaintiff Janice M. Anania is an individual who reside in Colts Neck, New Jersey and is the spouse of Plaintiff Joseph J. Anania, Jr.

14. Plaintiff William Annechini is an individual who resides in Phoenixville, Pennsylvania.

15. Plaintiff Claire Annechini is an individual who resides in Phoenixville, Pennsylvania and is the spouse of Plaintiff William Annechini.

16. Plaintiff Veronica Bekkedam is an individual who resides in Newtown Square, Pennsylvania.

17. Plaintiff Belk Foundation is a charitable foundation organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina.

18. Plaintiff Peter B. Benedict is an individual who resides in Vero Beach, Florida, and brings this action as trustee of the Peter B. Benedict Revocable Trust.

19. Plaintiff Benedict Foundation is a charitable foundation organized under the laws of the State of Florida with its principal place of business in Vero Beach, Florida.

20. Plaintiff Peter Benedict II is an individual who resides in Dayton, Ohio.

21. Plaintiff Harry J. Booth is an individual who resides in West Chester,

4

Pennsylvania.

22. Plaintiff Antoinette C. Booth is an individual who resides in West Chester, Pennsylvania and is the spouse of Plaintiff Harry J. Booth.

23. Plaintiff Anthony J. Bonomo is an individual who resides in Manhasset, New York.

24. Plaintiff Mary Ellen Bonomo is an individual who resides in Manhasset, New York and is the spouse of Anthony J. Bonomo.

25. Plaintiff Hugh T. Brennan is an individual who resides in Scottsdale, Arizona.

26. Plaintiff C. Ed. Carlisle is an individual who resides in Fairhope, Alabama.

27. Plaintiff Carmen Caruso is an individual who resides in Gulph Mills, Pennsylvania.

28. Plaintiff Fred Davis is an individual who resides in Mickleton, New Jersey.

29. Plaintiff Pat Davis is an individual who resides in Mickleton, New Jersey and is the spouse of Plaintiff Fred Davis.

30. Plaintiff Eugene J. Dowd, Jr. is an individual who resides in Bryn Mawr, Pennsylvania.

31. Plaintiff Charles Farrell is an individual who resides in Ormond Beach, Florida.

32. Plaintiff Ruth Farrell is an individual who resides in Ormond Beach, Florida and is the spouse of Plaintiff Charles Farrell.

33. Plaintiff Dr. Herbert Feinberg is an individual who resides in Englewood, New Jersey.

34. Plaintiff Steven Fink is an individual who resides in Philadelphia, Pennsylvania.

35. Plaintiff Brian Graden is an individual who resides in Los Angeles, California.

36. Plaintiff Judd Klement is an individual who resides in Los Altos, California.

37. Plaintiff Amy Rowe Klement is an individual who resides in Los Altos, California and is the spouse of Judd Klement.

38. Plaintiff The McFadzean 1998 Trust is a trust located in La Canada, California.

39. Plaintiff Arla J. Mertz is an individual who resides in Selingsgrove, Pennsylvania, and brings this action as trustee of the Arla J. Mertz Revocable Trust.

40. Plaintiff Barbara Mitchell is an individual who resides in Middletown, New Jersey, and brings this action as trustee of the Trust u/w James H. Mitchell FBO Barbara D. Mitchell.

41. Plaintiff Pauline Monson is an individual who resides in Phoenixville, Pennsylvania.

42. Plaintiff Nancy L. Paley is an individual who resides in Aspen, Colorado.

43. Plaintiff Daniel Radomski is an individual who resides in Boston, Massachusetts.

44. Plaintiff Frederick Rosen is an individual who resides in Royersford, Pennsylvania.

45. Plaintiff Lawrence Rovin is an individual who resides in Merion, Pennsylvania.

46. Plaintiff Richard Ruch Jr. is an individual who resides in Downingtown, Pennsylvania.

47. Plaintiff Ivan Scharer is an individual who resides in Boynton Beach, Florida.

48. Plaintiff Jay Scharer is an individual who resides in Miami, Florida.

49. Plaintiff D.V.F.G. Benefits, Inc. Pension Plan – Thomas Schirmer, trustee, is a trust that resides in Conshohocken, Pennsylvania.

50. Plaintiff Michael Selverne is an individual who resides in New York, New York.

51. Plaintiff Seravalli Financial Group, Inc. Profit Sharing Plan and Trust is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

52. Plaintiff Seravalli, Inc. is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

53. Plaintiff Marc Smith is an individual who resides in Huntingdon Valley, Pennsylvania.

54. Plaintiff William Spink is an individual who resides in West Chester, Pennsylvania.

55. Plaintiff Duce Staley is an individual who resides in Cayce, South Carolina.

56. Plaintiff Eileen Taylor is an individual who resides in Ponte Vedra Beach, Florida.

57. Plaintiff Donald Travis is an individual who resides in Jupiter, Florida.

58. Plaintiff Kim Tuski is an individual who resides in Spring City, Pennsylvania, and brings this action as trustee of Special Needs Trust FBO Joseph Tuski.

59. Plaintiff Brent Ware is an individual who resides in Franklin, Tennessee.

60. Plaintiff Judy Ware is an individual who resides in Franklin, Tennessee and is the spouse of Plaintiff Brent Ware.

61. Plaintiff Scot Ware is an individual who resides in Franklin, Tennessee.

62. Plaintiff White Oak Global Advisors, LLC is a limited liability corporation incorporated in Delaware, and is duly authorized to act on behalf of White Oak Strategic SRV, L.P. and White Oak Strategic SRV, Ltd.

63. Plaintiff Nick Worontzoff is an individual who resides in Wayne, Pennsylvania.

64.	Plaintiff Debra Zuccarini is an individual who resides in Newtown Square, Pennsylvania.

65.	Each of the Plaintiffs invested in Rothstein's structured settlement scheme through the Banyon Funds by purchasing limited partnership interests in the Funds.

66.	Defendant Rothstein is a citizen of the State of Florida.  At present he is in the custody of the United States Bureau of Prisons.  Formerly, Rothstein was Chairman and CEO of Rothstein, Rosenfeldt & Adler, PA, a law firm with approximately 70 attorneys with its principal place of business in Fort Lauderdale, Florida.

67.	Upon information and belief, Defendant TD Bank is a company incorporated under the laws of the State of Delaware.  TD Bank is registered to do business in the State of Florida and has its national headquarters in Portland, Maine.  TD Bank maintains substantial contact with Florida through its multiple branches throughout the State of Florida, including Fort Lauderdale (5900 North Andrews Avenue, 2nd Floor).  TD Bank participated in the scheme institutionally and through its duly authorized employees acting within the scope of their employment, including but not limited to Frank Spinosa, Regional Vice President, located in Fort Lauderdale, and Branch Manager and Assistant Vice President Rosanne Caretsky, also located in Fort Lauderdale.

68.	Defendant Gibraltar is a private bank and wealth management firm authorized to do business in the State of Florida.  Gibraltar maintains substantial contacts with Florida through its multiple offices within the State of Florida, including a principal office at 220 Alhambra Cir., Coral Gables, FL 33134.  Gibraltar participated in and provided substantial assistance to Rothstein's scheme institutionally and through its duly authorized employees acting within the scope of their employment, including but not limited to Senior Vice President John Harris and

8

Vice President Lisa Ellis.

## JURISDICTION AND VENUE

69.     This Court has jurisdiction over the subject matter of the causes of action in this Complaint under 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1964(c) (civil RICO) and 28 U.S.C. § 1367 (supplemental jurisdiction).

70.     This Court has jurisdiction over the Defendants because each Defendant either resides or transacts business within this judicial district and/or each Defendant is amenable to service of process within the meaning of Federal Rules of Civil Procedure 4(e) & (f).

71.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants either reside or transact business in this district and/or this district is where a substantial part of the events or omissions giving rise to the claims occurred.  Venue is also proper pursuant to 28 U.S.C. § 1965 because the Defendants either reside, may be found, have an agent, or transact their affairs in this District.

## FACTS

**The Ponzi Scheme**

72.     The Rothstein fraud centered on the sale of so-called "confidential structured settlements."  In sum, Rothstein solicited investors to purchase interests in litigation settlements that were reached with putative defendants based upon claims of sexual harassment and/or whistle-blower actions.

73.     Each of the litigation settlements were purportedly to be paid over a period of time.  Rothstein represented to his victims that because these "plaintiffs" were willing to accept a 20-40% discount in exchange for an immediate pay-out, the settlements could be purchased at a discounted value, resulting in a fixed and high yielding rate of return.  For example, Rothstein

9

represented to investors that a plaintiff with an alleged $450,000 settlement that was to be paid over six months would accept an immediate payment of $375,000.  The investor funded the up-front payment, and in return was paid back with the pre-funded settlement over time (minus Rothstein's fees and costs), generating a healthy "guaranteed" return.

74.     To induce the investment, investors or their representatives were given executed settlement agreements (with the parties' names redacted), "lock letters" from TD Bank showing that the putative defendant had already funded the entire settlement amount, and audited financial statements of the investment vehicles.

75.     Rothstein utilized a network of broker/dealers, investment advisors and close friends to "sell" his investment through various vehicles, the largest of which was the Banyon Funds.

76.     The Banyon Funds into which Plaintiffs invested are Delaware limited partnerships that were created specifically to invest in "structured settlements," including the bogus confidential settlements touted by Rothstein.

77.     The Plaintiffs in this action were introduced to the Banyon Funds by Barry Bekkedam, a Philadelphia-based investment advisor.

78.     Bekkedam provided individual investors with the Banyon offering memorandum ("Offering Memo") which described the investment as follows:

> The Partnership will buy Purchased Settlements from individual plaintiffs who have settled their non-tort labor and employment related lawsuits or claims, and who would otherwise receive their settlement amounts over a period of time.  The full settlement amount with respect to each Purchased Settlement will have been deposited in a trust account, established by the plaintiff's attorney for the benefit of the plaintiff, prior to a purchase by the Partnership and the Partnership will receive an assignment of the right to receive payments out of the trust account. These settlement amounts are released to the Partnership over time to liquidate the Purchased Settlement.  The purchase price for the Purchased Settlement will represent a discount from the aggregate amount of payments to be received,

typically approximately 30%, and the amount of the discount will represent the Partnership's gross income on the transaction.

The Partnership will focus on lawsuits and claims which are, by their nature, ones that former defendant employers would like kept confidential.  The settlement agreements typically provide for the payment of full settlement amounts to the trust account established by the plaintiff's attorney for the benefit of the plaintiff, and the periodic payment from such trust account to the plaintiff over a specified number of months, generally ranging from four (4) to twenty-four (24) months.

(Emphasis added)

79.     The investment was presented as simple and straightforward.  As a result, the Banyon Funds raised over $300 million from scores of investors, including nearly $40 million from the Plaintiffs, based upon the offering memoranda and related documents presented both to investors and to investment managers.

80.     Unbeknownst to Plaintiffs, the investment was nothing more than a Ponzi scheme. The so-called settlements were bogus, the funds were not "locked" in trust accounts, and the so-called "guaranteed returns" were illusory.  Instead, investor funds were moved between the Defendant Banks in an effort to cover redemptions before the scheme collapsed.

81.     When the fraud was uncovered, Rothstein initially fled to Morocco, but ultimately returned to Florida and surrendered to federal authorities.  He pled guilty to five criminal counts (federal racketeering conspiracy (Count I), conspiracy to launder money (Count II), conspiracy to commit mail and wire fraud (Count III) and wire fraud (Counts IV and V)) and is now serving a fifty (50) year prison sentence.

**Defendants' Obligations To Detect And Report Fraud**

82.     Banks such as the Defendant Banks are required by federal statute and concomitant banking regulations to have a detailed anti-money laundering program to detect fraud and illegal activity.  These anti-money laundering programs must include: (a) designation

11

of an individual or individuals responsible for managing compliance; (b) a system of policies, procedures, and internal controls to ensure ongoing compliance; (c) training for appropriate personnel; and (d) independent testing of compliance. 12 C.F.R. § 208.63.

83. The Office of the Comptroller of the Currency Bank Secrecy Act/AML Handbook identifies numerous "red flags" which may suggest potentially fraudulent conduct, and financial institutions must be on the look-out for these red flags as part of their transaction monitoring procedures. These warnings of potential illegal activity include: (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking or financial secrecy centers.

84. The principal purpose of anti-money laundering programs is to monitor customer account activity for possible fraud, money laundering or other improper activity. These monitoring requirements are premised on the fact that banks are often in the best position to identify and thwart potentially illegal activity taking place in their clients' accounts.

85. The federal government also provides guidance establishing the minimum standard of care banks should exercise to achieve the goal of detecting possible illegal activity, and what actions (including reporting the activity) to take once suspicious activity is identified.

86. As described below, Rothstein worked with the Defendant Banks to skirt the AML protocols, even when their own monitoring systems alerted them or should have alerted them to Rothstein's fraud. In return for this assistance and complicity, Rothstein handsomely rewarded the Banks and their executives.

**TD Bank's Wrongful Conduct**

87. Rothstein funneled hundreds of millions of dollars of victims' money (including

12

Plaintiffs') through TD Bank in connection with his Ponzi scheme.  For example, in one five-month period alone (April through September 2009) TD Bank helped Rothstein circulate more than $39,000,000 of victims' money among various accounts (representing a minute fraction of TD Bank's involvement), including Rothstein's law firm's trust accounts and purported "investor" accounts, such as Plaintiffs.

88.     For their part, Plaintiffs were told directly and indirectly that TD Bank was the repository of the fully-funded settlement trust accounts and that the bank could and would vouch for the availability of settlement funds.

89.     Senior TD Bank officials vouched for Rothstein during face-to-face meetings with representatives of the Banyon Funds prior to Plaintiffs' investment.  Likewise, TD Bank, upon information and belief also met with certain of the Banyon Funds' larger investors to confirm the bona fides of the settlement and bank transactions.

90.     As with Banyon, TD Bank employees went the "extra mile" to meet personally with potential scheme victims for the purpose of convincing victims to give Rothstein money and trust that the "investment" was legitimate.

91.     Plaintiffs directly and/or through their investment advisor, were also provided documentation confirming receipt and disbursement of alleged settlement funds.

92.     For example, a September 24, 2009 TD Bank "lock letter" provided to Plaintiffs' advisor, Bekkedam stated:

> Dear Mr. Rothstein:  Pursuant to your written instructions to us of September 23, 2009, please be advised that all funds contained in the above-referenced account shall only be distributed upon your or Stuart Rosenfeldt's instructions and shall only be distributed to Banyon Investment Fund, LP, Account number 6861076914, at TD Bank, routing number 067014822.  Your letter is understood not to convey ownership of the account or access to the account to any other party, but rather is meant to irrevocably restrict conveyances from this account to the Banyon Investment Fund, LP account.  [Signed Frank Spinosa, Regional Vice

13

President].

(See Ex. A).

93.     Defendants furnished the false and fraudulent "lock letters" so that Banyon Funds, and its investment advisors, could persuade the limited partners (including Plaintiffs) that controls were in place to guarantee that structured settlement proceeds purchased by Plaintiffs actually existed and would only be transferred to specifically designated TD Bank escrow accounts.

94.     Plaintiffs relied upon and were induced to invest by the fact that a large and respected bank was willing to stand behind the legitimacy of Rothstein and the investment.

95.     TD Bank authorized special treatment for Rothstein that included knowingly deviating from the mandatory fraud detection and anti-money laundering procedures regarding wire transfer protocols and repetitive movement of large sums of cash (in the millions of dollars) in and out of various accounts, including Rothstein's client trust accounts and accounts owned by RRA.

96.     TD Bank acting through Frank Spinosa, its Regional Vice President, Rosanne Caretsky, a Branch Manager and Assistant Vice President, and other duly authorized agents, created false documents knowing that they would be provided and used to solicit investment in the Ponzi scheme, including investment by Plaintiffs.

97.     Indeed, Rothstein provided Frank Spinosa, Rosanne Caretsky and other TD Bank employees with gifts (including cash) in payment for their participation and substantial assistance in facilitating the Ponzi scheme.

98.     In or around the summer of 2009, Rothstein paid Spinosa $50,000 in cash for his continuing cooperation and participation in the fraud.

99.     About the same time, Rothstein paid Caretsky $25,000 cash for her continuing

14

cooperation and participation in the fraud.

100. Rothstein has admitted that because he brought "big business" to TD Bank, the bank intentionally turned a blind eye to his "habits," practices and fraudulent scheme.

101. In short, TD Bank's actual knowledge of the Ponzi scheme is buttressed by Rothstein's plea of guilty and the fact that TD Bank, institutionally and through its employees, had the motive and opportunity to substantially assist Rothstein, did so, and actually profited from its participation.

102. Furthermore, TD Bank, as a matter of federal banking regulations and in accordance with the standard of care in the banking industry, was responsible for verifying the source and legitimacy of large fund transfer transactions. Indeed, the pattern and magnitude of the monetary transfers should have triggered an immediate investigation by TD Bank's anti-money laundering unit which would have discovered the fraud. Either TD Bank (a) followed applicable anti-money laundering regulations and best practices, discovered the fraud, and (nevertheless) continued to participate in the fraudulent scheme, or (b) TD Bank intentionally turned a blind eye.

103. By November 1, 2009, RRA and TD Bank were unable to account for certain trust funds belonging to the Banyon investors, including Plaintiffs, and other fraud victims. Rothstein withdrew the funds without the knowledge and consent of his investors, which ran afoul of the purported protections TD Bank represented it would provide.

104. By late November 2009, TD Bank fired Frank Spinosa as a result of his complicity in the fraud. Indeed, Spinosa has asserted his Fifth Amendment right against self-incrimination in response to questions concerning his and TD Bank's knowledge of and complicity in Rothstein's fraud.

15

105.   To date, Rothstein has admitted certain key facts which demonstrate that TD Bank aided and abetted his notorious Ponzi scheme.

106.   Specifically, Rothstein has admitted in his Plea Agreement that:

- In or about 2005, Rothstein and other co-conspirators initiated a scheme to generate criminal proceeds through fraudulent acts;

- Rothstein and his co-conspirators created false and fraudulent settlement agreements, bank statements, assignment of settlement agreements, sale and transfer agreements and personal guarantees, among other agreements;

- Rothstein and his co-conspirators established and maintained trust accounts at several financial institutions in order to receive the investor funds and to give the appearance of legitimacy and security;

- Rothstein and his co-conspirators created false and fictitious trust account bank balance statements were created along with purported bank "lock letters."  Such letters allegedly reflected that the funds in the trust would be dispersed only to specific investors. Instead funds were disbursed among and between various trust accounts and elsewhere by interstate wire transfers and other means in order to facilitate, promote and conceal the fraud, to launder the proceeds derived therefrom, and to enrich Rothstein and his co-conspirators;

- Rothstein and his co-conspirators created fraudulent on-line banking documents to further mislead investors and to facilitate the fraud;

- Rothstein and his co-conspirators knowingly and intentionally engaged in mail fraud, wire fraud and money laundering through the transmission of funds among and between financial institutions (including specifically TD Bank and Gibraltar); and

- The proceeds derived from the Ponzi scheme were laundered through accounts maintained at several financial institutions in order to promote, carry on and conceal Rothstein's criminal activities.

**Gibraltar's Wrongful Conduct**

107.   At all relevant times, Gibraltar was the repository of several RRA accounts, along with many of Rothstein's escrow, family and business accounts.

108.   Despite being well aware of its duties and responsibilities relating to the maintenance of these accounts, including their own internal policies and prudent banking

16

practices, Gibraltar nonetheless played a critical role in Rothstein's Ponzi scheme.

109.  For the Ponzi scheme to work, Rothstein needed to re-pay his investors their promised returns.   Until the scheme imploded in 2009, Rothstein did this by shifting, manipulating and comingling funds from legitimate client trust accounts (obtained through his law firm RRA) and Rothstein's personal accounts with investor funds (including Plaintiffs' money).  Gibraltar was the bank through which much of this fraudulent activity occurred.

110.  Gibraltar routinely extended Rothstein credit whenever Rothstein did not have sufficient funds to repay investors in his Ponzi scheme or meet other obligations, in violation of Gibraltar's own internal policies and banking regulations.

111.  Gibraltar, in turn, paid more than 450 overdrafts.  Rothstein repeatedly overdrew his accounts and some of the overdrafts totaled millions of dollars each.   Indeed, Gibraltar advanced more than $64 million in total overdraft loans between April 2006 and September 2008.

112.  The sheer volume and magnitude of this activity was, at a minimum, a red flag for fraudulent activity to which Gibraltar at least knowingly or recklessly turned a blind eye.

113.  All told, hundreds of millions of dollars belonging to Rothstein's victims, including Plaintiffs passed through accounts at Gibraltar.

114.  As a consequence of Gibraltar's failure to adhere to its own internal policies and banking practices, Gibraltar reaped hundreds of thousands of dollars in fees and charges for its assistance as well as other financial benefits, including over $200,000 alone in NSF (not sufficient funds) fees for the period July through September 2008.

115.  In addition, the large sums of fraud victim money deposited at Gibraltar in Rothstein's various accounts allowed the bank the opportunity to enlarge its lending practices

17

and aggressively pursue increases to its bottom line.

116.    Upon information and belief, Gibraltar, at Rothstein's request, also routinely modified, deviated from, and/or bypassed internal controls and anti-money laundering policies designed to prevent fraud, including an internal monetary control/anti-money laundering unit responsible for verifying the source and legitimacy of large fund transfer transactions.

117.    Upon information and belief, Gibraltar through its senior officers advised Rothstein on money shifting strategies to avoid detection by investors, bank regulators, tax authorities and other agencies.

118.    Notably, in late 2008, Gibraltar's then Chief Operating Officer resigned after openly confronting a Gibraltar senior officer about the preferential treatment Rothstein received and why "internal controls" were not being followed when it came to Rothstein's accounts.

119.    John Harris, a Gibraltar Senior Vice President, routinely communicated with Rothstein through email, and on at least one occasion Rothstein threatened to withdraw accounts from the bank and convince lucrative clients to leave the bank if Gibraltar executives questioned Rothstein or otherwise failed to grant his assistance requests.

120.    Indeed, in his emails to Harris, Rothstein referred to the Bank as his "partner" and described how Gibraltar is "on the team:"

     a.    In a September 8, 2006 email to Harris, Rothstein wrote the following in response to Gibraltar's inquiries concerning overdrafts:

> If they are going to start putting pressure on us again every time the account is od from the previous nights pod they can kiss my firm, my consulting group, albert, ovi, ovi's dad, roger, the Bahamas deal and all the rest that goes with me goodbye . . . I will not be pushed or pressured by the idiot's in credit ever again . . . And you can tell them if they screw around with me I will be sure to tell everyone of their clients that I represent and that I am close to exactly what they are doing . . . you and Lisa [Ellis] are great and I do not want anything to effect our relationship

18

but after all I have done and what I have proved I can do I will not put up with even the slightest level of bullshit from them . . .

b.  In a November 13, 2006 email to Harris, Rothstein wrote:

tell them [Gibraltar credit compliance] to f*** off . . . if they want my friends as clients they need to deal with it when things get dicey . . .

c.  In a November 17, 2006 email to Harris, Rothstein wrote:

Johnny boy . . . we need to establish a protocol with the folks in the gables regarding my accounts.  Neither you nor I nor Lisa nor Irene needs the pressure they apply . . . They cannot be my "best buds" when we are cranking, and then forget my name when we have a blip on the screen . . . even if it is a major blip . . . They cannot be my "best buds" when I am doing all that I can to refer bank business and then forget my name when they feel like forgetting what I am trying to do for my business and their business.   I bank with you because we treat each other with respect and because we understand the true meaning of what it is to be partners in something amazing . . . They are either on the team and want my firm or they do not."

121.  Other emails between Gibraltar VPs Harris and Lisa Ellis and Rothstein evidence the "special treatment" Rothstein received from Gibraltar executives to accommodate his fraudulent scheme and those executives' actual knowledge of the scheme include:

a.  A March 24, 2008 email from Ellis to Rothstein stated:

I need to show your payroll account as being positive for at least one entire day out of the quarter so that it does not go on the 90 O/D list which goes in front of the powers that be.

b.  An October 31, 2008 email from Ellis to Rothstein noted:

you had a couple of big checks come in on your personal account and we need 488K to cover.  Let me know if you want me to pull from Banyon.

(Emphasis added).

c.  A December 5, 2008 email from Harris to Rothstein subject "coverage in accounts needed!" stating:

to cover o/d [i.e., overdrafts] today.  RRA operating is (42M), Rothstein

personal (168M); rra payroll (67M); waww9 (128M) riley renov (157M) total is -$570,000.  Please effect transfers at your very earliest opportunity.

122.    Upon information and belief, Gibraltar Senior Vice President Harris received rewards for his complacency in the form of lavish "gifts" from Rothstein (including a $20,000 Rolex watch).

123.    Other Gibraltar executives likewise received gifts/kickbacks from Rothstein in the form of cash, expensive luxury items, favors and/or other benefits in exchange for their complicity and participation in the fraud.

124.    On or about May 9, 2009, Gibraltar's internal fraud investigation team, led by Bank Security Act Compliance Officer Julia Ansari, inquired regarding suspicious Rothstein wire transfers that occurred between May and September 2008 in the amount of approximately $15 million.  Rothstein was notified of the investigation.

125.    To cover his tracks, Rothstein had his accountants send Ansari a letter shortly thereafter explaining the reason for the wire transfers.  Ansari and Gibraltar's Chief Risk and Compliance Officer, Chuck Sanders, however, were skeptical of the letter received, presumably because it did not adequately explain the wire transfers, and raised their suspicions to Gibraltar's senior executive team.

126.    The bank's internal investigation, however, was shut down by Gibraltar's CEO and other senior Gibraltar executives because, according to them, Rothstein was one of the bank's "best clients."  In short, Rothstein was substantially assisted by the most senior officers at Gibraltar who did not want to jeopardize Rothstein's patronage of the bank.

127.    On September 17, 2009, Gibraltar was purchased by a group of private investors from Boston Private Financial Holdings for $93 million.  Rothstein invested $5 million for a 5-6% stake in the bank, less than the 10% threshold that would trigger certain federal regulatory

20

and compliance scrutiny.

128.    The Ponzi scheme collapsed in October 2009 when Rothstein, even with Defendants' assistance, began to default on "guaranteed" structured payments to investors. Investors began to demand payment and question the legitimacy of the bank controls and the representations made by Rothstein to induce Plaintiffs' investment.

129.    On or about May 5, 2010, the Office of Thrift Supervision ("OTS") examined Gibraltar and thereafter brought an enforcement proceeding styled In the Matter of Gibraltar Private Bank and Trust Company, OTS Docket Number 08007.

130.    As a result, Gibraltar entered into a Stipulation and Consent to Issuance of Order to Cease and Desist with OTS that detailed the deficiencies in Gibraltar's oversight and compliance which allowed Rothstein's scheme to continue and flourish at victims' (including Plaintiffs') expense.

131.    For example, the Stipulation notes that Gibraltar:

Has engaged in unsafe or unsound banking practices including, but not limited to, operating: the [bank] with an ineffective Bank Secrecy Act/Anti-Money Laundering compliance program, . . . (d) in contravention of supervisory policy statements and other regulatory guidance, including but not limited to: (i) Interagency Guidelines Establishing Standards for Safety and Soundness . . . (iii) Federal Financial Institutions Examination Council Bank Secrecy Act/Anti-Money Laundering Examination Manual.

132.    The Stipulation also contains the OTS's finding that Gibraltar violated numerous federal laws and regulations designed to prevent fraud, including 12 C.F.R. § 563.177(c)(1); 12 C.F.R. § 563.177(c)(4); 12 C.F.R. § 563.180(d)(3)(iv)(C); 12 C.F.R. § 563.180(d)(5); 12 C.F.R., § 563.180(d)(10) and 12 C.F.R. § 563.180(d)(12).

133.    In January 2011, Gibraltar's Chief Financial Officer resigned.

134.    In short, without Gibraltar's substantial and deliberate assistance that

21

included violations of multiple banking regulations and ignoring its own internal anti-fraud policies, Rothstein's Ponzi scheme could not have succeeded as long as it did.

### COUNT I- FEDERAL RICO VIOLATIONS
(**Against all Defendants**)

135.   Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 134 above.

136.   Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from the Defendants for violation of 18 U.S.C. § 1962(c).

137.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

138.   Commencing in or around 2005 and continuing until approximately November 2009, the Defendants violated 18 U.S.C. § 1962(c).

### The Enterprise

139.   At all relevant times, Defendants (Rothstein, TD Bank and Gibraltar) associated in fact with each other and with others known and unknown so as to constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  At all times relevant to this Complaint, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

140.   The "association in fact" Enterprise had an ascertainable structure and organization and existed apart from its predicate acts.  Defendants associated with the Enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the Enterprise's activities.

141.   The Defendants associated with each other for the common purpose of defrauding Plaintiffs and converting their funds and property for Defendants' personal gain.

142.    In furtherance of the Enterprise, Rothstein, TD Bank and Gibraltar committed numerous overt acts, as set forth above, including violation of the wire fraud, interstate transportation of stolen property, and money laundering statutes.

### The Purpose and Object of the Racketeering Activity

143.    The principal purpose of the racketeering conspiracy was to generate money for Defendants and others through the operation of the Enterprise and various criminal activities, including wire fraud and money laundering.

144.    Defendants and others agreed to engage in a pattern of racketeering activity using various locations, including but not limited to several TD Bank branches and offices located in South Florida and Gibraltar's South Florida office, to further the objectives of the Enterprise.

### Direction of the Enterprise's Affairs

145.    Defendants knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise within the meaning of 18 U.S.C. § 1962(c). Furthermore, the Defendants were "employed by or associated with" the Enterprise within the meaning of 18 U.S.C. § 1962(c).

146.    Rothstein directed and managed the Enterprise's activities through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

147.    Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(c).

## The Pattern of Racketeering Activity

148.    In the course of conducting and participating in the "structured settlement" Enterprise, Defendants executed numerous predicate acts of racketeering activity, including but not limited to mail fraud, wire fraud, money laundering and racketeering which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

149.    As described throughout this Complaint, the Defendants engaged in a pattern of related and continuous predicate acts over a substantial, but closed, period of time.   The unitary scheme began sometime in or around 2005 and continued until approximately November 2009.

150.    The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose to defraud Plaintiff and other victims and obtain millions of dollars.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts are related and are not isolated events.

151.    The predicate acts all had the purpose of diverting and misappropriating monies that Plaintiffs and others had invested with and through the Defendants.  The predicate acts were committed or caused to be committed by Defendants, and were interrelated in that they involved using Plaintiffs' funds.  Further, on information and belief, Defendants' misappropriation repeatedly involved diversion of funds for:  (a) Defendants' personal benefit and (b) making purported payments to certain investors to conceal their theft of other funds pursuant to the scheme i.e., a classic Ponzi scheme.

152.    More specifically, Defendants enhanced the credibility of the purported

investment opportunity by utilizing the offices of RRA and Defendant Banks to convince Plaintiffs and others of the legitimacy and safety of the investment.

## RICO Injury

153. By virtue of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have sustained substantial injury to both its business and its property.

154. Defendants' RICO violations were the actual cause of Plaintiffs' damages, which would not have occurred without Defendants' conduct.  In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs, including, but not limited, the loss of Plaintiffs' funds.  Defendants profited from their RICO acts and used some proceeds to further their RICO enterprise.

## COUNT II- CONSPIRACY TO VIOLATE FEDERAL RICO
### (Against all Defendants)

155. Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 154 above.

156. Count II seeks relief against Defendants for violation of 18 U.S.C. § 1962(d).

157. In violation of 18 U.S.C. § 1962(d), Defendants and others known and unknown conspired with each other to violate 18 U.S.C. § 1962(a)-(c).

158. The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiffs and others by means of a scheme to defraud. By these misappropriations, Defendants gained personal benefits; obtained funds directly from the conversion of Plaintiffs' funds for their own use; and fraudulently profited through their fraudulent scheme.

159. Defendants agreed and combined with persons known and unknown to do

a criminal or unlawful act, or a lawful act by criminal or unlawful means.  Defendants by his or its words or actions, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the Enterprise.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(d).

160.    Defendants' agreement to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional and working relationships; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank/financial accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.  Defendants' agreement was manifested by the number and similarity of the racketeering offenses committed by them as discussed above.

161.    At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy.  Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

162.    As described above, the conspiratorial agreement was an agreement to participate in an enterprise which engaged in racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1962(a) – (c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

163.    As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(a)-(c).  Defendants knew

that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

164.    As a result of one or more acts predicate to the conspiracy and Defendants' conduct or participation in the conduct of the Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained substantial injury to both their businesses and their property, including the loss of potential investors and the loss of Plaintiffs' funds.

165.    Defendants' acts and violations were the actual cause of Plaintiffs' damages, which would not have occurred without the Defendants' conduct.  In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs, as set forth above.

### COUNT III – AIDING AND ABETTING CONVERSION
**(Against Defendants)**

166.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 165 above.

167.    As detailed above, Rothstein admits that he was operating a Ponzi scheme.  In furtherance of the Ponzi scheme, Rothstein exercised unauthorized dominion and control over Plaintiffs' property when he stole their money.

168.    Rothstein's conversion of Plaintiffs' funds has permanently deprived Plaintiffs of their property.

169.    Defendants, institutionally and through their employees who were acting within the scope of their employment, knowingly, willfully and with actual knowledge provided Rothstein substantial assistance in converting their property and/or by deceiving Plaintiffs to turn over their property to Rothstein under false pretenses.

27

170.     Defendants' actions have directly caused injury and damage to Plaintiffs.

## COUNT IV – AIDING AND ABETTING FRAUD
### (Against Defendants)

171.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 170 above.

172.     As detailed above, Rothstein admits that he was operating a Ponzi scheme.  In furtherance of the Ponzi scheme, Rothstein defrauded the Plaintiffs.

173.     Defendants knew of Rothstein's scheme and knowingly and willfully provided Rothstein with substantial assistance in defrauding Plaintiffs through knowingly false material statements and representations, including, but not limited to, by providing false bank records and financial information concerning the Banyon Funds to potential victims, including Plaintiffs, and otherwise assisting Rothstein while having actual knowledge of his fraudulent scheme.

174.     Defendants, institutionally and through their employees who were acting within the scope of their employment, intended for potential investor victims, including Plaintiffs, to act on their knowingly false representations.

175.     As a direct and proximate result of Defendants' actions, Plaintiffs have sustained damages.

## COUNT V – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendants)

176.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 175 above.

177.     As detailed above, Rothstein admitted that he was operating a Ponzi scheme.  In furtherance of the scheme, Rothstein violated the fiduciary duties owed to investors, including the Plaintiffs as the attorney of the trust accounts where Plaintiffs' purported settlement funds

were deposited.

178.   Defendants, institutionally and through their employees who were acting within the scope of their employment, knowingly, willfully, and with actual knowledge of Rothstein's malfeasance provided Rothstein substantial assistance in breaching his fiduciary duties.

179.   Defendants' actions have directly caused injury and damage to the Plaintiffs.

## COUNT VI – UNJUST ENRICHMENT
### (Against Defendants)

180.   Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 179 above.

181.   As detailed above, Defendants were unjustly enriched by their complicity and substantial participation in Rothstein's fraud.

182.   Equity and good conscience require full restitution of the monies received by Defendants from Rothstein belonging to Plaintiffs.  This includes not only the money itself but also the proceeds from that money.  Any profits and fees earned with the money must also be returned.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiffs pray for trial by jury and request that the Court:

A.   Enter judgment in favor of Plaintiffs and against Defendants jointly and severally;

B.   Award Plaintiffs treble damages for all injuries deemed to have resulted from Defendants' racketeering activities, pursuant to 18 U.S.C. §1964(c);

C.   Award Plaintiffs compensatory damages in an amount to be determined at trial;

D.   Impose a constructive trust on Defendants in favor of Plaintiffs for the proceeds (including profits and fees) from unlawful activity relating to Plaintiffs;

E.      Award Plaintiffs punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct;

F.      Award Plaintiffs their costs, interest, and reasonable attorneys' fees incurred in prosecuting this action pursuant to 18 U.S.C. § 1964; and

G.      Such other and further relief as this Court may deem just and proper.

Dated: July 28, 2011

By: /s/ Martin B. Goldberg

**MARTIN B. GOLDBERG**
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
**GREG J. WEINTRAUB**
Florida Bar No. 75741
gweintraub@lashgoldberg.com
LASH & GOLDBERG LLP
Suite 1200, Miami Tower
100 S.E. Second Street
Miami, Florida 33131
2700 South Commerce Parkway, Suite 305
Weston, Florida  33331
Tel: (305) 347-4040
Fax: (305) 347-4050
*Co-counsel for Plaintiffs*

Michael Paris, Esq.
Massachusetts BBO No. 556791*
mparis@nbparis.com
William C. Nystrom, Esq.
Massachusetts BBO No. 559656*
wnystrom@nbparis.com
Jack I. Siegal, Esq.
Massachusetts BBO No. 669173*
jsiegal@nbparis.com
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, Massachusetts  02210
T: (617) 778-9100
F: (617) 778-9110
*Co-counsel for Plaintiffs*

\* *Pro hac vice* applications to be filed

30