UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

_____

| | |
|---|---|
| AMY ADAMS, et. al, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 0:11-CV-61688-JIC/LSS |
| SCOTT W. ROTHSTEIN, TD BANK, N.A. and | ) |
| GIBRALTAR PRIVATE BANK AND TRUST | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

_____)

## [CORRECTED] FIRST AMENDED COMPLAINT[1]

The above-captioned Plaintiffs bring this First Amended Complaint against Defendants SCOTT W. ROTHSTEIN ("Rothstein"), TD BANK, N.A. ("TD Bank") and GIBRALTAR PRIVATE BANK AND TRUST COMPANY ("Gibraltar") and allege as follows:

### INTRODUCTION

1.      The sixty-two (62) named Plaintiffs comprise one of the largest known groups of victims of Rothstein's notorious and widely publicized $1.2 billion Ponzi scheme, collectively losing nearly $40 million in the so-called Banyon Income Funds (the "Banyon Funds").

2.      Rothstein has admitted to perpetuating one of the largest fraudulent schemes in history.  He has pled guilty to five felonies and is currently serving a fifty (50) year sentence in federal prison.  Rothstein's Ponzi scheme and ensuing losses to scores of individual investors occurred through the assistance of Rothstein's bankers, Defendants TD Bank and Gibraltar, both of whom played critical roles in selling and facilitating Rothstein's structured settlement scheme

---

[1] This [Corrected] First Amended Complaint removes paragraph 139 of the First Amended Complaint and makes a corresponding change to paragraph 6.

to unwitting investors.

3.　　As detailed below, TD Bank aided and abetted Rothstein's scheme by deliberately ignoring banking laws designed specifically to protect the public from money laundering, fraud and Ponzi schemes.　TD Bank also provided, including to Plaintiffs, false bank and financial records to lend credibility to Rothstein's scheme and to induce their investment.　Indeed, TD Bank vouched for the validity of bogus settlement accounts to the managing agents of the Banyon Funds and/or their investment advisor.

4.　　In return for facilitating the Rothstein scheme, TD Bank received significant new business from Rothstein and his associates and co-conspirators, cycling hundreds of millions of dollars (of investors' funds) through Rothstein's law firm, Rothstein, Rosenfeldt & Adler ("RRA"), client trust accounts and other slush fund accounts.　TD Bank employees also received lavish gifts from Rothstein.

5.　　In the aftermath of the scheme's collapse, TD Bank employees have asserted their Fifth Amendment rights to avoid answering questions concerning their involvement in Rothstein's fraud while Rothstein's accomplices at RRA continue to plead guilty to criminal activity.

6.　　For its part, Gibraltar provided Rothstein substantial credit extensions totaling more than $64 million over approximately two years, to allow Rothstein to sustain the Ponzi scheme.　Gibraltar also deviated from and intentionally ignored internal anti-money laundering controls to accommodate Rothstein's demands.　Executives at Gibraltar advised Rothstein about how to skirt red flags that would garner the attention of federal banking oversight agencies. Finally, Gibraltar allowed Rothstein to transfer millions of dollars among client trust funds, business accounts and personal accounts at will.　In return, Gibraltar received large transaction

fees, commissions and even personal "gifts" from Rothstein to the tune of hundreds of thousands of dollars.

7.      In short, both banks (institutionally and through their employees) had actual knowledge and/or at minimum constructive knowledge of, and provided substantial assistance to, Rothstein's Ponzi scheme.  As such, they (along with Rothstein) are jointly and severally liable to Plaintiffs for the full amount of their damages.

## PARTIES

8.      Plaintiff Amy Adams is an individual who resides in Charlotte, North Carolina.

9.      Plaintiff Frank Adams is an individual who resides in Hilton Head, South Carolina.

10.     Plaintiff Scott Adams is an individual who resides in Charlotte, North Carolina.

11.     Plaintiff, The Trustees of the Administrators for the Professions, Inc. Defined Benefit Pension Plan, sue on behalf of the Administrators for the Professions, Inc. Defined Benefit Pension Plan ("AFPDBPP"), an employee retirement plan sponsored by Administrators for the Professions, Inc., a corporation organized under the laws of New York with its principal place of business in Roslyn, New York.

12.     Plaintiff Joseph J. Anania, Jr. is an individual who resides in Colts Neck, New Jersey.

13.     Plaintiff Janice M. Anania is an individual who reside in Colts Neck, New Jersey and is the spouse of Plaintiff Joseph J. Anania, Jr.

14.     Plaintiff Edward Andricola is an individual who resides in Sewell, New Jersey.

15.     Plaintiff Mary Andricola is an individual who resides in Sewell, New Jersey and is the spouse of Edward Andricola.

16.    Plaintiff William Annechini is an individual who resides in Phoenixville, Pennsylvania.

17.    Plaintiff Claire Annechini is an individual who resides in Phoenixville, Pennsylvania and is the spouse of Plaintiff William Annechini.

18.    Plaintiff Veronica Bekkedam is an individual who resides in Newtown Square, Pennsylvania.

19.    Plaintiff Belk Foundation is a charitable foundation organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina.

20.    Plaintiff Peter B. Benedict is an individual who resides in Vero Beach, Florida, and brings this action as trustee of the Peter B. Benedict Revocable Trust.

21.    Plaintiff Benedict Foundation is a charitable foundation organized under the laws of the State of Florida with its principal place of business in Vero Beach, Florida.

22.    Plaintiff Peter Benedict II is an individual who resides in Dayton, Ohio.

23.    Plaintiff Harry J. Booth is an individual who resides in West Chester, Pennsylvania.

24.    Plaintiff Antoinette C. Booth is an individual who resides in West Chester, Pennsylvania and is the spouse of Plaintiff Harry J. Booth.

25.    Plaintiff Anthony J. Bonomo is an individual who resides in Manhasset, New York.

26.    Plaintiff Mary Ellen Bonomo is an individual who resides in Manhasset, New York and is the spouse of Anthony J. Bonomo.

27.    Plaintiff Hugh T. Brennan is an individual who resides in Scottsdale, Arizona.

28.    Plaintiff C. Edward Carlisle is an individual who resides in Fairhope, Alabama.

29.     Plaintiff Carmen Caruso is an individual who resides in Gulph Mills, Pennsylvania.

30.     Plaintiff Fred Davis is an individual who resides in Mickleton, New Jersey.

31.     Plaintiff Pat Davis is an individual who resides in Mickleton, New Jersey and is the spouse of Plaintiff Fred Davis.

32.     Plaintiff Eugene J. Dowd, Jr. is an individual who resides in Bryn Mawr, Pennsylvania.

33.     Plaintiff Charles Farrell is an individual who resides in Ormond Beach, Florida.

34.     Plaintiff Ruth Farrell is an individual who resides in Ormond Beach, Florida and is the spouse of Plaintiff Charles Farrell.

35.     Plaintiff Dr. Herbert Feinberg is an individual who resides in Englewood, New Jersey.

36.     Plaintiff Steven Fink is an individual who resides in Philadelphia, Pennsylvania.

37.     Plaintiff Brian Graden is an individual who resides in Los Angeles, California.

38.     Plaintiff William P. Hauser is an individual who lives in Kennett Square, Pennsylvania.

39.     Plaintiff Judd Klement is an individual who resides in Los Altos, California.

40.     Plaintiff Amy Rowe Klement is an individual who resides in Los Altos, California and is the spouse of Judd Klement.

41.     Plaintiff The McFadzean 1998 Trust is a trust located in La Canada, California.

42.     Plaintiff Arla J. Mertz is an individual who resides in Selinsgrove, Pennsylvania, and brings this action as trustee of the Arla J. Mertz Revocable Trust.

43.     Plaintiff Barbara Mitchell is an individual who resides in Middletown, New

Jersey, and brings this action as trustee of the Trust u/w James H. Mitchell FBO Barbara D. Mitchell.

44.     Plaintiff Pauline Monson is an individual who resides in Phoenixville, Pennsylvania.

45.     Plaintiff Nancy L. Paley is an individual who resides in Aspen, Colorado.

46.     Plaintiff Paulette Perhacs is an individual who resides in Moorestown, New Jersey.

47.     Plaintiff Daniel Radomski is an individual who resides in Boston, Massachusetts.

48.     Plaintiff Frederick Rosen is an individual who resides in Royersford, Pennsylvania.

49.     Plaintiff Lawrence Rovin is an individual who resides in Merion, Pennsylvania.

50.     Plaintiff Richard Ruch Jr. is an individual who resides in Downingtown, Pennsylvania.

51.     Plaintiff Ivan Scharer is an individual who resides in Boynton Beach, Florida.

52.     Plaintiff Jay Scharer is an individual who resides in Miami, Florida.

53.     Plaintiff Thomas Schirmer is the trustee of D.V.F.G. Benefits, Inc. Pension Plan and resides in Radnor, Pennsylvania.

54.     Plaintiff Stacy Selverne Trust is a trust whose trustee is Michael Selverne, an individual who resides in New York, New York.

55.     Plaintiff Seravalli Financial Group, Inc. Profit Sharing Plan and Trust is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

56.     Plaintiff Seravalli, Inc. is a corporation organized under the laws of the State of

Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

57.     Plaintiff Marc Smith is an individual who resides in Huntingdon Valley, Pennsylvania.

58.     Plaintiff William Spink is an individual who resides in West Chester, Pennsylvania.

59.     Plaintiff Duce Staley is an individual who resides in Cayce, South Carolina.

60.     Plaintiff Eileen Taylor is an individual who resides in Ponte Vedra Beach, Florida.

61.     Plaintiff Donald Travis is an individual who resides in Jupiter, Florida.

62.     Plaintiff Kim Tuski is an individual who resides in Spring City, Pennsylvania, and brings this action as trustee of Special Needs Trust FBO Joseph Tuski.

63.     Plaintiff Brent Ware is an individual who resides in Franklin, Tennessee.

64.     Plaintiff Judy Ware is an individual who resides in Franklin, Tennessee and is the spouse of Plaintiff Brent Ware.

65.     Plaintiff Scot Ware is an individual who resides in Franklin, Tennessee.

66.     Plaintiff White Oak Global Advisors, LLC ("White Oak") is a limited liability corporation incorporated in Delaware, and is duly authorized to act on behalf of White Oak Strategic SRV, L.P. and White Oak Strategic SRV, Ltd.

67.     Plaintiff Nick Worontzoff is an individual who resides in Wayne, Pennsylvania.

68.     Plaintiff Debra Zuccarini is an individual who resides in Newtown Square, Pennsylvania.

69.     Each of the Plaintiffs invested in Rothstein's structured settlement scheme through the Banyon Funds by purchasing limited partnership interests in the Funds.

70.     Nominal Plaintiffs Banyon Income Fund L.P. and Banyon Income Fund II L.P. (the "Funds") are Delaware limited partnerships with their principal places of business in Fort Lauderdale, Florida.  Banyon 1030-32 LLC, a Nevada Limited Liability Company is the general partner of the Funds and its managing agent is George Levin.

71.     Defendant Rothstein is a citizen of the State of Florida.  At present he is in the custody of the United States Bureau of Prisons.  Formerly, Rothstein was Chairman and CEO of Rothstein, Rosenfeldt & Adler, PA (RRA), a law firm with approximately 70 attorneys with its principal place of business in Fort Lauderdale, Florida.

72.     Upon information and belief, Defendant TD Bank is a national bank incorporated under the laws of the State of Delaware.  TD Bank is registered to do business in the State of Florida and has its national headquarters in Portland, Maine.  TD Bank maintains substantial contact with Florida through its multiple branches throughout the State of Florida, including Fort Lauderdale (5900 North Andrews Avenue, 2nd Floor).  TD Bank participated in the scheme institutionally and through its duly authorized employees acting within the scope of their employment, including but not limited to managing agent Frank Spinosa, Regional Vice President, located in Fort Lauderdale, and Branch Manager and Assistant Vice President Rosanne Caretsky, a managing agent also located in Fort Lauderdale.

73.     Defendant Gibraltar is a private bank and wealth management firm authorized to do business in the State of Florida.  Gibraltar maintains substantial contacts with Florida through its multiple offices within the State of Florida, including a principal office at 220 Alhambra Circle, Coral Gables, FL 33134.  Gibraltar participated in and provided substantial assistance to Rothstein's scheme institutionally and through its duly authorized employees acting within the scope of their employment, including but not limited to managing agents Senior Vice President

John Harris and Vice President Lisa Ellis.

## JURISDICTION AND VENUE

74.     This Court has jurisdiction over the subject matter of the causes of action in this Complaint under 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1964(c) (civil RICO) and 28 U.S.C. § 1367 (supplemental jurisdiction).

75.     This Court has jurisdiction over the Defendants because each Defendant either resides or transacts business within this judicial district and/or each Defendant is amenable to service of process within the meaning of Federal Rules of Civil Procedure 4(e) & (f).

76.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants either reside or transact business in this district and/or this district is where a substantial part of the events or omissions giving rise to the claims occurred.  Venue is also proper pursuant to 28 U.S.C. § 1965 because the Defendants either reside, may be found, have an agent, or transact their affairs in this District.

## FACTS

### The Ponzi Scheme

77.     The Rothstein fraud centered on the sale of so-called "confidential structured settlements."  In sum, Rothstein solicited investors to purchase interests in litigation settlements that were reached with putative defendants based upon claims of sexual harassment and/or whistle-blower actions.

78.     Each of the litigation settlements were purportedly to be paid over a period of time.  Rothstein represented to his victims that because these "plaintiffs" were willing to accept a 20-40% discount in exchange for an immediate pay-out, the settlements could be purchased at a discounted value, resulting in a fixed and high yielding rate of return.  For example, Rothstein

represented to investors that a plaintiff with an alleged $450,000 settlement that was to be paid over six months would accept an immediate payment of $375,000.  The investor funded the up-front payment, and in return was paid back with the pre-funded settlement over time (minus Rothstein's fees and costs), generating a healthy "guaranteed" return.

79.     To induce the investment, investors or their representatives were given executed settlement agreements (with the parties' names redacted), "lock letters" from TD Bank showing that the putative defendant had already funded the entire settlement amount, and audited financial statements of the investment vehicles.

80.     Rothstein utilized a network of broker/dealers, investment advisors and close friends to "sell" his investment through various vehicles, the largest of which was the Banyon Funds.

81.     The Banyon Funds into which Plaintiffs invested are Delaware limited partnerships that were created specifically to invest in "structured settlements," including the bogus confidential settlements touted by Rothstein.

82.     The Plaintiffs in this action were introduced to the Banyon Funds by Barry Bekkedam, a Philadelphia-based investment advisor and a principal of Ballamor Capital Management ("Ballamor").

83.     Bekkedam provided individual investors with the Banyon offering memorandum ("Offering Memo") which described the investment as follows:

> The Partnership will buy Purchased Settlements from individual plaintiffs who have settled their non-tort labor and employment related lawsuits or claims, and who would otherwise receive their settlement amounts over a period of time.  The full settlement amount with respect to each Purchased Settlement <u>will have been deposited in a trust account</u>, established by the plaintiff's attorney for the benefit of the plaintiff, prior to a purchase by the Partnership and the Partnership will receive an assignment of the right to receive payments out of the trust account. These settlement amounts are released to the Partnership over time to liquidate the

Purchased Settlement.  The purchase price for the Purchased Settlement will represent a discount from the aggregate amount of payments to be received, typically approximately 30%, and the amount of the discount will represent the Partnership's gross income on the transaction.

The Partnership will focus on lawsuits and claims which are, by their nature, ones that former defendant employers would like kept confidential.  The settlement agreements typically provide for the payment of full settlement amounts to the trust account established by the plaintiff's attorney for the benefit of the plaintiff, and the periodic payment from such trust account to the plaintiff over a specified number of months, generally ranging from four (4) to twenty-four (24) months.

(Emphasis added)

84.     The investment was presented as simple and straightforward.  As a result, the Banyon Funds raised over $300 million from scores of investors, including nearly $40 million from the Plaintiffs, based upon the offering memoranda and related documents presented both to investors and to investment managers.

85.     Unbeknownst to Plaintiffs, the investment was nothing more than a Ponzi scheme. The so-called settlements were bogus, the funds were not "locked" in trust accounts, and the so-called "guaranteed returns" were illusory.  Instead, investor funds were moved between the Defendant Banks in an effort to cover redemptions before the scheme collapsed.

86.     When the fraud was uncovered, Rothstein initially fled to Morocco, but ultimately returned to Florida and surrendered to federal authorities.  He pled guilty to five criminal counts (federal racketeering conspiracy (Count I), conspiracy to launder money (Count II), conspiracy to commit mail and wire fraud (Count III) and wire fraud (Counts IV and V)) and is now serving a fifty (50) year prison sentence.

**White Oak's Contact with TD Bank**

87.     Plaintiff White Oak first heard of the Banyon Funds on or about September 23, 2009.  Specifically, Ballamor contacted White Oak about purchasing structured settlements

through an investment vehicle called "Banyon," which was established and controlled by an individual named George Levin.

88.    Ballamor told White Oak that it (Ballamor) had recommended and was continuing to recommend Banyon to its clients and that its clients were experiencing high returns from the Banyon investment.

89.    Ballamor emphasized that the investment was low risk given the procedural safeguards in place to ensure that the structured settlements were fully funded.  Specifically, Ballamor represented that TD Bank was involved and suggested that White Oak contact George Levin, the managing agent for Banyon, for further information.

90.    White Oak, an investment management firm with prior experience with structured settlement-like investments, thought the Banyon investment suggested by Ballamor was worth investigating.

91.    Accordingly, Pat Clemens of White Oak contacted George Levin, the principal of the Banyon Funds, who directed him to Frank Preve, who Levin said was an employee of Banyon 1030-32, LLC, the managing general partner of the Banyon Fund, and Levin's "right hand man."  Levin stated that Preve could provide details concerning the structured settlement investment.

92.    Clemens then spoke with Preve on multiple occasions during which Preve explained that the investment involved settlements with high profile individuals and entities who had been sued by clients of Scott Rothstein's law firm.  Preve also stated that the settling defendants were willing to pay a high price to keep their identity and peccadilloes secret.

93.    Preve further explained that the purported "settlement funds" were sent by the putative defendants to locked accounts at TD Bank that were monitored by the bank and

specifically assigned to each investor.  In addition, the accounts could only be accessed by specifically authorized persons at the bank and Banyon.

94.    Preve identified Frank Spinosa, area Vice President of TD Bank, as his primary bank contact.

95.    Clemens asked Preve if he could talk to Spinosa to confirm TD Bank's role. Preve agreed and provided Clemens with a phone number he represented was Spinosa's direct dial phone number.

96.    On September 30, 2009, Clemens called the phone number provided by Preve. An individual answered the phone and identified himself as Frank Spinosa of TD Bank.   During the call, Spinosa confirmed the bona fides of the investments, TD Bank's role and how settlement funds were "locked."

97.    A few days later, Clemens received in the mail a sample "lock letter" from Spinosa in a TD Bank envelope.  The lock letter is attached as **Exhibit A** hereto.

98.    In reliance on Spinosa's oral representations as confirmed by the "lock letter," White Oak invested $15 million into the Banyon Funds.  At Banyon's instructions, the money was sent directly to TD Bank.  See **Exhibit B** attached hereto (wire confirmation).

99.    Rothstein's fraudulent scheme imploded less than one month later.

**Defendants' Obligations To Detect And Report Fraud**

100.    Banks like TD Bank and Gibraltar are required by federal statute and concomitant banking regulations to have a detailed anti-money laundering program to detect fraud and illegal activity.  These anti-money laundering programs must include: (a) designation of an individual or individuals responsible for managing compliance; (b) a system of policies, procedures and internal controls to ensure ongoing compliance; (c) training for appropriate personnel; and (d)

independent testing of compliance.  12 C.F.R. § 208.63.

101.    The Office of the Comptroller of the Currency Bank Secrecy Act/AML ("Anti Money Laundering") Handbook identifies numerous "red flags" which may suggest potentially fraudulent conduct, and financial institutions must be on the look-out for these red flags as part of their transaction monitoring procedures.  These warnings of potential illegal activity include: (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking or financial secrecy centers.

102.    The principal purpose of anti-money laundering programs is to monitor customer account activity for possible fraud, money laundering or other improper activity.  These monitoring requirements are premised on the fact that banks are often in the best position to identify and thwart potentially illegal activity taking place in their clients' accounts.

103.    The federal government also provides guidance establishing the minimum standard of care banks should exercise to achieve the goal of detecting possible illegal activity, and what actions (including reporting the activity) to take once suspicious activity is identified.

104.    As described below, Rothstein worked with the Defendant Banks to skirt the AML protocols, even when their own monitoring systems alerted them or should have alerted them to Rothstein's fraud.  In return for this assistance and complicity, Rothstein handsomely rewarded the Banks and their executives.

**TD Bank's Wrongful Conduct**

105.    Rothstein funneled hundreds of millions of dollars of victims' money (including Plaintiffs') through TD Bank in connection with his Ponzi scheme.  For example, in one five-

month period alone (April through September 2009) TD Bank helped Rothstein circulate more than $39,000,000 of victims' money among various accounts (representing a minute fraction of TD Bank's involvement), including Rothstein's law firm's trust accounts and purported "investor" accounts, such as Plaintiffs.

106.    For their part, Plaintiffs were told directly and indirectly that TD Bank was the repository of the fully-funded settlement trust accounts and that the bank could and would vouch for the availability of settlement funds.

107.    Senior TD Bank officials vouched for Rothstein during face-to-face meetings with representatives of the Banyon Funds prior to Plaintiffs' investment. Likewise, TD Bank, upon information and belief, also met with certain of the Banyon Funds' larger investors to confirm the bona fides of the settlement and bank transactions.

108.    As with Banyon, TD Bank employees "went the extra mile" to meet personally with potential scheme victims for the purpose of convincing them to give Rothstein money and trust that the "investment" was legitimate.

109.    Plaintiffs directly and/or through their investment advisor, were also provided documentation confirming receipt and disbursement of alleged settlement funds.

110.    For example, a September 24, 2009 TD Bank "lock letter" provided to Plaintiffs' advisor, Bekkedam, stated:

> Dear Mr. Rothstein: Pursuant to your written instructions to us of September 23, 2009, please be advised that all funds contained in the above-referenced account shall only be distributed upon your or Stuart Rosenfeldt's instructions and shall only be distributed to Banyon Investment Fund, LP, Account number 6861076914, at TD Bank, routing number 067014822. Your letter is understood not to convey ownership of the account or access to the account to any other party, but rather is meant to irrevocably restrict conveyances from this account to the Banyon Investment Fund, LP account. [Signed Frank Spinosa, Regional Vice President].

(See **Exhibit A**).

111.    Defendants furnished the false and fraudulent "lock letters" so that Banyon Funds, and its investment advisors, could persuade the limited partners (including Plaintiffs) that controls were in place to guarantee that structured settlement proceeds purchased by Plaintiffs actually existed and would only be transferred to specifically designated TD Bank escrow accounts.

112.    Plaintiffs relied upon, and were induced to invest by, the fact that a large and respected bank was willing to stand behind the legitimacy of Rothstein and the investment.

113.    TD Bank authorized special treatment for Rothstein that included knowingly deviating from the mandatory fraud detection and anti-money laundering procedures regarding wire transfer protocols and repetitive movement of large sums of cash (in the millions of dollars) in and out of various accounts, including Rothstein's client trust accounts and accounts owned by RRA.

114.    TD Bank acting through managing agents Frank Spinosa, its Regional Vice President, and Rosanne Caretsky, a Branch Manager and Assistant Vice President, and other duly authorized agents, created false documents knowing that they would be provided  to potential victims and used to solicit investment in the Ponzi scheme, including investment by Plaintiffs.

115.    Indeed, Rothstein provided Frank Spinosa, Rosanne Caretsky and other TD Bank employees with gifts (including cash) in payment for their participation and substantial assistance in facilitating the Ponzi scheme.

116.    Rothstein has admitted that because he brought "big business" to TD Bank, the bank intentionally turned a blind eye to his "habits," practices and fraudulent scheme.

117.    In short, TD Bank's actual knowledge of the Ponzi scheme is buttressed by Rothstein's plea of guilty and the fact that TD Bank, institutionally and through its employees, had the motive and opportunity to substantially assist Rothstein, did so, and actually profited from its participation.

118.    Furthermore, TD Bank, as a matter of federal banking regulations and in accordance with the standard of care in the banking industry, was responsible for verifying the source and legitimacy of large fund transfer transactions.  Indeed, the pattern and magnitude of the monetary transfers should have triggered an immediate investigation by TD Bank's anti-money laundering unit which would have discovered the fraud.  Either TD Bank (a) followed applicable anti-money laundering regulations and best practices, discovered the fraud, and (nevertheless) continued to participate in the fraudulent scheme, or (b) TD Bank intentionally turned a blind eye.

119.    By November 1, 2009, RRA and TD Bank were unable to account for certain trust funds belonging to the Banyon investors, including Plaintiffs, and other fraud victims.  Rothstein withdrew the funds without the knowledge and consent of his investors, which ran afoul of the purported protections TD Bank represented it would provide.

120.    By late November 2009, TD Bank fired Frank Spinosa as a result of his complicity in the fraud.  Indeed, Spinosa has asserted his Fifth Amendment right against self-incrimination in response to questions concerning his and TD Bank's knowledge of, and complicity in, Rothstein's fraud.

121.    To date, Rothstein has admitted certain key facts which demonstrate that TD Bank aided and abetted his notorious Ponzi scheme.

122.    Specifically, Rothstein has admitted in his Plea Agreement that:

- In or about 2005, Rothstein and other co-conspirators initiated a scheme to generate criminal proceeds through fraudulent acts;

- Rothstein and his co-conspirators created false and fraudulent settlement agreements, bank statements, assignment of settlement agreements, sale and transfer agreements and personal guarantees, among other agreements;

- Rothstein and his co-conspirators established and maintained trust accounts at several financial institutions in order to receive the investor funds and to give the appearance of legitimacy and security;

- Rothstein and his co-conspirators created false and fictitious trust account bank balance statements along with purported bank "lock letters." Such letters allegedly reflected that the funds in the trust would be dispersed only to specific investors. Instead funds were disbursed among and between various trust accounts and elsewhere by interstate wire transfers and other means in order to facilitate, promote and conceal the fraud, to launder the proceeds derived therefrom and to enrich Rothstein and his co-conspirators;

- Rothstein and his co-conspirators created fraudulent on-line banking documents to further mislead investors and to facilitate the fraud;

- Rothstein and his co-conspirators knowingly and intentionally engaged in mail fraud, wire fraud and money laundering through the transmission of funds among and between financial institutions (including, specifically, TD Bank and Gibraltar); and

- The proceeds derived from the Ponzi scheme were laundered through accounts maintained at several financial institutions in order to promote, carry on and conceal Rothstein's criminal activities.

**Gibraltar's Wrongful Conduct**

123.    At all relevant times, Gibraltar was the repository of several RRA accounts, along with many of Rothstein's escrow, family and business accounts.

124.    Despite being well aware of its duties and responsibilities relating to the maintenance of these accounts, including their own internal policies and prudent banking practices, Gibraltar nonetheless played a critical role in Rothstein's Ponzi scheme.

125.    For the Ponzi scheme to work, Rothstein needed to re-pay his investors their

promised returns.   Until the scheme imploded in 2009, Rothstein did this by shifting, manipulating and comingling funds from legitimate client trust accounts (obtained through his law firm RRA) and Rothstein's personal accounts with investor funds (including Plaintiffs' money).  Gibraltar was the bank through which much of this fraudulent activity occurred.

126.   Gibraltar routinely extended Rothstein credit whenever Rothstein did not have sufficient funds to repay investors in his Ponzi scheme or meet other obligations, in violation of Gibraltar's own internal policies and banking regulations.

127.   Indeed, Gibraltar paid more than <u>450</u> overdrafts.  Rothstein repeatedly overdrew his accounts and some of the overdrafts totaled millions of dollars each.  Between April 2006 and September 2008, moreover, Gibraltar advanced more than $64 million in total overdraft loans.

128.   The sheer volume and magnitude of this activity was, at a minimum, a red flag for fraudulent activity to which Gibraltar at least knowingly or recklessly turned a blind eye.

129.   All told, hundreds of millions of dollars belonging to Rothstein's victims, including Plaintiffs, passed through accounts at Gibraltar.

130.   As a consequence of Gibraltar's failure to adhere to its own internal policies and banking practices, Gibraltar reaped hundreds of thousands of dollars in fees and charges for its assistance as well as other financial benefits, including over $200,000 alone in NSF (not sufficient funds) fees for the period July through September 2008.

131.   In addition, the large sums of fraud victim money deposited at Gibraltar in Rothstein's various accounts enabled the bank to increase its cash position and lend more money, leading to greater bank profits.

132.   Upon information and belief, Gibraltar, at Rothstein's request, also routinely

modified, deviated from, and/or bypassed internal controls and anti-money laundering policies designed to prevent fraud, including an internal monetary control/anti-money laundering unit responsible for verifying the source and legitimacy of large fund transfer transactions.

133.    Upon information and belief, Gibraltar, through its senior officers, advised Rothstein on money shifting strategies to avoid detection by investors, bank regulators, tax authorities and other agencies.

134.    Notably, in late 2008, Gibraltar's then Chief Operating Officer resigned after openly confronting a Gibraltar senior officer about the preferential treatment Rothstein received and why "internal controls" were not being followed when it came to Rothstein's accounts.

135.    John Harris, a Gibraltar Senior Vice President and managing agent, routinely communicated with Rothstein through email, and on at least one occasion Rothstein threatened to withdraw accounts from the bank and convince lucrative clients to leave the bank if Gibraltar executives questioned Rothstein or otherwise failed to grant his assistance requests.

136.    Indeed, in his emails to Harris, Rothstein referred to the Bank as his "partner" and described how Gibraltar is "on the team":

a.      In a September 8, 2006 email to Harris, Rothstein wrote the following in response to Gibraltar's inquiries concerning overdrafts:

> If they are going to start putting pressure on us again every time the account is od from the previous nights pod they can kiss my firm, my consulting group, albert, ovi, ovi's dad, roger, the Bahamas deal and all the rest that goes with me goodbye . . . I will not be pushed or pressured by the idiot's in credit ever again . . . And you can tell them if they screw around with me I will be sure to tell everyone of their clients that I represent and that I am close to exactly what they are doing . . . you and Lisa [Ellis] are great and I do not want anything to effect our relationship but after all I have done and what I have proved I can do I will not put up with even the slightest level of bull**** from them . . .

b.      In a November 13, 2006 email to Harris, Rothstein wrote:

20

tell them [Gibraltar credit compliance] to f*** off . . . if they want my friends as clients they need to deal with it when things get dicey . . .

c.   In a November 17, 2006 email to Harris, Rothstein wrote:

Johnny boy . . . we need to establish a protocol with the folks in the gables regarding my accounts.  Neither you nor I nor Lisa nor Irene needs the pressure they apply . . . They cannot be my "best buds" when we are cranking, and then forget my name when we have a blip on the screen . . . even if it is a major blip . . . They cannot be my "best buds" when I am doing all that I can to refer bank business and then forget my name when they feel like forgetting what I am trying to do for my business and their business.   I bank with you because we treat each other with respect and because we understand the true meaning of what it is to be partners in something amazing . . . They are either on the team and want my firm or they do not."

137.   Other emails between Gibraltar VPs Harris and Lisa Ellis (another managing agent) and Rothstein evidence the "special treatment" Rothstein received from Gibraltar executives to accommodate his fraudulent scheme and those executives' actual knowledge of the scheme include:

a.   A March 24, 2008 email from Ellis to Rothstein stated:

I need to show your payroll account as being positive for at least one entire day out of the quarter so that it does not go on the 90 O/D list which goes in front of the powers that be.

b.   An October 31, 2008 email from Ellis to Rothstein noted:

you had a couple of big checks come in on your personal account and we need 488K to cover.  Let me know if you want me to pull from Banyon.

(Emphasis added).

c.   A December 5, 2008 email from Harris to Rothstein subject "coverage in accounts needed!" stating:

to cover o/d [i.e., overdrafts] today.  RRA operating is (42M), Rothstein personal (168M); rra payroll (67M); waww9 (128M) riley renov (157M) total is -$570,000.  Please effect transfers at your very earliest opportunity.

138.    Upon information and belief, Gibraltar Senior Vice President Harris received rewards for his complacency in the form of lavish "gifts" from Rothstein (including a $20,000 Rolex watch).

139.    On or about May 9, 2009, Gibraltar's internal fraud investigation team, led by Bank Security Act Compliance Officer Julia Ansari, inquired regarding suspicious Rothstein wire transfers that occurred between May and September 2008 in the amount of approximately $15 million.  Rothstein was notified of the investigation.

140.    To cover his tracks, Rothstein had his accountants send Ansari a letter shortly thereafter explaining the reason for the wire transfers.  Ansari and Gibraltar's Chief Risk and Compliance Officer, Chuck Sanders, however, were skeptical of the letter received, presumably because it did not adequately explain the wire transfers, and raised their suspicions to Gibraltar's senior executive team.

141.    The bank's internal investigation, however, was shut down by Gibraltar's CEO and other senior Gibraltar executives because, according to them, Rothstein was one of the bank's "best clients."  In short, Rothstein was substantially assisted by the most senior officers at Gibraltar who did not want to jeopardize Rothstein's patronage of the bank.

142.    On September 17, 2009, Gibraltar was purchased by a group of private investors from Boston Private Financial Holdings for $93 million.  Rothstein invested $5 million for an approximately 6% stake in the bank, less than the 10% threshold that would trigger certain federal regulatory and compliance scrutiny.

143.    The Ponzi scheme collapsed in October 2009 when Rothstein, even with Defendants' assistance, began to default on "guaranteed" structured payments to investors. Investors began to demand payment and question the legitimacy of the bank controls and the

representations made by Rothstein to induce Plaintiffs' investment.

144.    On or about May 5, 2010, the Office of Thrift Supervision ("OTS") examined Gibraltar and thereafter brought an enforcement proceeding styled <u>In the Matter of Gibraltar Private Bank and Trust Company</u>, OTS Docket Number 08007.

145.    As a result, Gibraltar entered into a Stipulation and Consent to Issuance of Order to Cease and Desist with OTS that detailed the deficiencies in Gibraltar's oversight and compliance which allowed Rothstein's scheme to continue and flourish at victims' (including Plaintiffs') expense.

146.    For example, the Stipulation notes that Gibraltar:

Has engaged in unsafe or unsound banking practices including, but not limited to, operating: the [bank] with an ineffective Bank Secrecy Act/Anti-Money Laundering compliance program, . . . (d) in contravention of supervisory policy statements and other regulatory guidance, including but not limited to: (i) Interagency Guidelines Establishing Standards for Safety and Soundness . . . (iii) Federal Financial Institutions Examination Council Bank Secrecy Act/Anti-Money Laundering Examination Manual.

147.    The Stipulation also contains the OTS's finding that Gibraltar violated numerous federal laws and regulations designed to prevent fraud, including 12 C.F.R. § 563.177(c)(1); 12 C.F.R. § 563.177(c)(4); 12 C.F.R. § 563.180(d)(3)(iv)(C); 12 C.F.R. § 563.180(d)(5); 12 C.F.R., § 563.180(d)(10) and 12 C.F.R. § 563.180(d)(12).

148.    In January 2011, Gibraltar's Chief Financial Officer resigned.

149.    In short, without Gibraltar's substantial and deliberate assistance that included violations of multiple banking regulations and ignoring its own internal anti-fraud policies, Rothstein's Ponzi scheme could not have succeeded, let alone as long as it did.

**Demand Futility Allegations**

150.    Each Plaintiff described in paragraphs 8 through 68 <u>supra</u> (the "Individual Plaintiffs") are limited partners in Banyon Income Fund, L.P. or Banyon Income Fund II, L.P, a Delaware limited partnership.

151.    The Individual Plaintiffs bring the claims set forth below both individually and derivatively on behalf of the Banyon Funds pursuant to 6 Del. c.17, § 17-1001 et seq.

152.    Delaware law allows limited partners, such as the Individual Plaintiffs, to bring suit on behalf of a partnership, such as the Banyon Funds, against third parties where demand on the general partner and its decision makers to bring the suit on behalf of the partnership would be futile.  <u>See</u> 6 Del. c.17, § 17-1001 et seq.

153.    Here, demand on the general partner of the Funds, Banyon 1030-32 LLC (and George Levin, its managing agent) to assert the claim set forth below on behalf of the partnership is futile for at least three reasons.

154.    <u>First</u>, Banyon 1030-32 LLC, George Levin and Frank Preve are apparently co-conspirators in Rothstein's fraudulent scheme.  <u>See</u> RICO Statement filed on August 29, 2011.  Levin's involvement in Rothstein's scheme is evident based upon, among other things, the fact that he was in Rothstein's "inner circle" of confidants and had knowledge that the scheme was fraudulent.  Preve, moreover, worked hand-in-hand with Rothstein to pump Banyon money into the scheme.

155.    Emails sent by Levin to Rothstein in October 2009, as the scheme was imploding, demonstrate Levin's knowledge of Rothstein's fraud, including Rothstein's inability to make payments from "settlements" that were supposedly fully funded.

156.    On October 30, 2009, Levin emailed Rothstein to discuss what "**<u>we</u>**" [<u>i.e.</u>, he and

Rothstein] were going to do given that a large payment (the was supposedly fully-funded) was about to be missed:

> If we don't make Doug's [Von Allmen] payment tomorrow, **I am afraid the game will be over!** Just when we were going to put the ball over the goal next week. Aj goes for $ wed of next week! We won't be able to recover.  This being their first payment! I will calm Barry [Bekkadam] down, however Doug will be impossible to calm down!  **The entire town will know this by tomorrow night! Why wouldn't this payment be made?** No matter what it takes tomorrow the payment will be made!  This means if Scott has to release some of the $400,000.000+ that he is holding, enough to cover the payments then, that's what we are going to have to do.  **We can't let the entire business go down over this, if we keep cool heads and take the course of least resistance we will get over this tomorrow.**  If we stick our heads in the sand, or think this is going to be like the NY boys, this strategy will never recover . . .

(Emphasis added).

157.    On October 31, 2009, Preve emailed to Rothstein that the "shortage" is $300 million which is "still manageable if **we** have your cooperation."  In response, Rothstein emailed Preve

> That is not the shortage . . . . . that is the amount of money needed to give the investors back their money.  **I really just need to end it frank.  It will make it easier for everyone**.

(Emphasis added).

158.    In short, it would be futile for the Individual Plaintiffs to make a demand on Banyon 1030-32 (the general partner) and its sole decision maker, George Levin, to prosecute claims of Banyon Funds when they and other Banyon 1030-32 officers (including Frank Preve) had knowledge of, and apparently directly participated in, the wrongdoing.  In short, it would be asking them to sue themselves.  For this reason alone, demand is futile.

159.    Second, Banyon 1030-32 LLC and Levin personally profited from Rothstein's fraudulent scheme and are hopelessly conflicted.  Each received hundreds of millions of dollars of investors' money.  Upon information and belief, Levin personally profited to the tune of

millions of dollars either directly or through various enterprises that he directly controls.  By contrast, Plaintiffs lost millions of dollars.

160.     In addition, Rothstein's former law firm, RRA, is in Chapter 11 bankruptcy.  The trustee of the RRA estate and Levin have entered into an agreement whereby Levin agreed to relinquish some personal assets and <u>all</u> the assets of the Banyon Funds, in exchange for a bankruptcy court Bar Order that would provide Levin with immunity from further suit for actions related to the Rothstein fraud.  In other words, Levin has agreed to give away the Banyon Funds' valuable causes of actions, including those against the Defendants asserted herein to avoid personal liability.

161.     In short, through this proposed settlement, Levin, in a clear breach of the duty of loyalty among other fiduciary duties, is hoping to sell out the Individual Plaintiffs to save himself.  Demand is futile based on this irreconcilable conflict of interest.

162.     Upon information and belief, Banyon 1030-32 LLC is in the process of negotiating its own separate agreement with the RRA estate trustee similar to Levin's.

163.     <u>Third</u>, Banyon 1030-32 LLC (the managing general partner) and Levin (the managing agent of the general partner) are each in Chapter 7 bankruptcy (<u>In re Banyon</u>, 1030-32 LLC, 10-33691-BKC-RBR (Bankr. S.D. Fla.); <u>In re George Levin</u>, 10-33696-BKC-RBR (Bankr. S.D. Fla.)).  Neither is authorized by their respective bankruptcy courts to assert claims.  Accordingly, it would be futile to demand that they bring claims they cannot bring given their bankrupt status.

### COUNT I- FEDERAL RICO VIOLATIONS[2]
(**Against all Defendants**)

164.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in

---

[2] The contents of Plaintiffs' RICO statement filed August 29, 2011 are incorporated herein by this reference and are attached as **Exhibit C**.

paragraphs 1 through 163 above.

165.    Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from the Defendants for violation of 18 U.S.C. § 1962(c).

166.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

167.    Commencing in or around 2005 and continuing until approximately November 2009, the Defendants violated 18 U.S.C. § 1962(c).

## The Enterprise

168.    At all relevant times, Defendants (Rothstein, TD Bank and Gibraltar) associated in fact with each other and with others known and unknown so as to constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   At all times relevant to this Complaint, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

169.    The "association in fact" Enterprise had an ascertainable structure and organization and existed apart from its predicate acts.  Defendants associated with the Enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the Enterprise's activities.

170.    The Defendants associated with each other for the common purpose of defrauding Plaintiffs and converting their funds and property for Defendants' personal gain.

171.    In furtherance of the Enterprise, Rothstein, TD Bank and Gibraltar committed numerous overt acts, as set forth above, including violation of the wire fraud, interstate transportation of stolen property, and money laundering statutes.

## The Purpose and Object of the Racketeering Activity

172.    The principal purpose of the racketeering conspiracy was to generate money for

Defendants and others through the operation of the Enterprise and various criminal activities, including wire fraud and money laundering.

173.     Defendants and others agreed to engage in a pattern of racketeering activity using various locations, including but not limited to several TD Bank branches and offices located in South Florida and Gibraltar's South Florida office, to further the objectives of the Enterprise.

**Direction of the Enterprise's Affairs**

174.     Defendants knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise within the meaning of 18 U.S.C. § 1962(c). Furthermore, the Defendants were "employed by or associated with" the Enterprise within the meaning of 18 U.S.C. § 1962(c).

175.     Rothstein directed and managed the Enterprise's activities through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

176.     Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(c).

**The Pattern of Racketeering Activity**

177.     In the course of conducting and participating in the "structured settlement" Enterprise, Defendants executed numerous predicate acts of racketeering activity, including but not limited to mail fraud, wire fraud, money laundering and racketeering which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

178.     As described throughout this Complaint, the Defendants engaged in a pattern of related and continuous predicate acts over a substantial, but closed, period of time.  The unitary

scheme began sometime in or around 2005 and continued until approximately November 2009.

179.    The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose to defraud Plaintiff and other victims and obtain millions of dollars.   The predicate acts also had the same or similar results, participants, victims, and methods of commission.   The predicate acts are related and are not isolated events.

180.    The predicate acts all had the purpose of diverting and misappropriating monies that Plaintiffs and others had invested with and through the Defendants.   The predicate acts were committed or caused to be committed by Defendants, and were interrelated in that they involved using Plaintiffs' funds.   Further, on information and belief, Defendants' misappropriation repeatedly involved diversion of funds for:  (a) Defendants' personal benefit and (b) making purported payments to certain investors to conceal their theft of other funds pursuant to the scheme i.e., a classic Ponzi scheme.

181.    More specifically, Defendants enhanced the credibility of the purported investment opportunity by utilizing the offices of RRA and Defendant Banks to convince Plaintiffs and others of the legitimacy and safety of the investment.

### **RICO Injury**

182.    By virtue of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have sustained substantial injury to both its business and property.

183.    Defendants' RICO violations were the actual cause of Plaintiffs' damages, which would not have occurred without Defendants' conduct.   In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs, including, but not limited, the loss of Plaintiffs' funds.   Defendants profited from their RICO acts and used some proceeds to

further their RICO enterprise.

### COUNT II- CONSPIRACY TO VIOLATE FEDERAL RICO
#### (Against all Defendants)

184.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 183 above.

185.     Count II seeks relief against Defendants for violation of 18 U.S.C. § 1962(d).

186.     In violation of 18 U.S.C. § 1962(d), Defendants and others known and unknown conspired with each other to violate 18 U.S.C. § 1962(a)-(c).

187.     The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiffs and others by means of a scheme to defraud.    By these misappropriations, Defendants gained personal benefits; obtained funds directly from the conversion of Plaintiffs' funds for their own use; and fraudulently profited through their fraudulent scheme.

188.     Defendants agreed and combined with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means.  Defendants by his or its words or actions, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the Enterprise.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(d).

189.     Defendants' agreement to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional and working relationships; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank/financial accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts

of the others.  Defendants' agreement was manifested by the number and similarity of the racketeering offenses committed by them as discussed above.

190.    At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy.  Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

191.    As described above, the conspiratorial agreement was an agreement to participate in an enterprise which engaged in racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1962(a) – (c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

192.    As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(a)-(c).  Defendants knew that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

193.    As a result of one or more acts predicate to the conspiracy and Defendants' conduct or participation in the conduct of the Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained substantial injury to both their businesses and their property, including the loss of potential investors and the loss of Plaintiffs' funds.

194.    Defendants' acts and violations were the actual cause of Plaintiffs' damages, which would not have occurred without the Defendants' conduct.  In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs, as set forth above.

**COUNT III – FRAUD**
**(White Oak Against TD Bank)**

195.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in Paragraphs 1 through 194 above.

31

196.     As detailed above, on September 30, 2009, Frank Spinosa, Area Vice-President of TD Bank, told Plaintiff White Oak that "structured settlement funds" were locked in individual investor accounts.  Shortly thereafter, Spinosa sent White Oak a copy of a lock letter to confirm his representation.

197.     As explained above, each statement by Mr. Spinosa, made in his capacity as a duly authorized officer/employee at TD Bank, was false when made because the settlements were fake and the investor accounts were not locked or otherwise protected.

198.     Spinosa made these statements intentionally to deceive White Oak.

199.     White Oak relied on Spinosa's statements to its detriment and was damaged thereby.

## <u>COUNT IV – AIDING AND ABETTING CONVERSION</u>
### (Against Defendants)

200.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 199 above.

201.     As detailed above, Rothstein admits that he was operating a Ponzi scheme.  In furtherance of the Ponzi scheme, Rothstein exercised unauthorized dominion and control over Plaintiffs' property when he stole their money.

202.     Rothstein's conversion of Plaintiffs' funds has permanently deprived Plaintiffs of their property.

203.     Defendants, institutionally and through their employees who were acting within the scope of their employment, knowingly, willfully and with actual knowledge provided Rothstein substantial assistance in converting their property and/or by deceiving Plaintiffs to turn over their property to Rothstein under false pretenses.

204.     Defendants' actions have directly caused injury and damage to Plaintiffs.

## COUNT V – AIDING AND ABETTING FRAUD
### (Against Defendants)

205.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 204 above.

206.    As detailed above, Rothstein admits that he was operating a Ponzi scheme.  In furtherance of the Ponzi scheme, Rothstein defrauded the Plaintiffs.

207.    Defendants knew of Rothstein's scheme and knowingly and willfully provided Rothstein with substantial assistance in defrauding Plaintiffs through knowingly false material statements and representations, including, but not limited to, by providing false bank records and financial information concerning the Banyon Funds to potential victims, including Plaintiffs, and otherwise assisting Rothstein while having actual knowledge of his fraudulent scheme.

208.    Defendants, institutionally and through their employees who were acting within the scope of their employment, intended for potential investor victims, including Plaintiffs, to act on their knowingly false representations.

209.    As a direct and proximate result of Defendants' actions, Plaintiffs have sustained damages.

## COUNT VI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendants)

210.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 209 above.

211.    As detailed above, Rothstein admitted that he was operating a Ponzi scheme.  In furtherance of the scheme, Rothstein violated the fiduciary duties owed to investors, including the Plaintiffs, as the attorney of the trust accounts where Plaintiffs' purported settlement funds were deposited.

212.     Defendants, institutionally and through their employees who were acting within the scope of their employment, knowingly, willfully, and with actual knowledge of Rothstein's malfeasance provided Rothstein substantial assistance in breaching his fiduciary duties.

213.     Defendants' actions have directly caused injury and damage to the Plaintiffs.

## COUNT VII – UNJUST ENRICHMENT
### (Against Defendants)

214.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 213 above.

215.     As detailed above, Defendants were unjustly enriched by their complicity and substantial participation in Rothstein's fraud.

216.     Equity and good conscience require full restitution of the monies received by Defendants from Rothstein belonging to Plaintiffs.  This includes not only the money itself but also the proceeds from that money.  Any profits and fees earned with the money must also be returned.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiffs pray for trial by jury and request that the Court:

A.     Enter judgment in favor of Plaintiffs and against Defendants jointly and severally;

B.     Award Plaintiffs treble damages for all injuries deemed to have resulted from Defendants' racketeering activities, pursuant to 18 U.S.C. §1964(c);

C.     Award Plaintiffs compensatory damages in an amount to be determined at trial;

D.     Impose a constructive trust on Defendants in favor of Plaintiffs for the proceeds (including profits and fees) from unlawful activity relating to Plaintiffs;

Case No. 0:11-CV-61688-JIC/LSS

     E.     Award Plaintiffs punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct;

     F.     Award Plaintiffs their costs, interest, and reasonable attorneys' fees incurred in prosecuting this action pursuant to 18 U.S.C. § 1964; and

     G.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

ATTORNEYS FOR ABOVE-CAPTIONED PLAINTIFFS,

By: /s/ Martin B. Goldberg_____

Dated:  October 6, 2011

**MARTIN B. GOLDBERG**
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
**GREG J. WEINTRAUB**
Florida Bar No. 75741
gweintraub@lashgoldberg.com
LASH & GOLDBERG LLP
Suite 1200, Miami Tower
100 S.E. Second Street
Miami, Florida 33131
*Co-counsel for Plaintiffs*

Michael Paris, Esq.
Massachusetts BBO No. 556791*
mparis@nbparis.com
William C. Nystrom, Esq.
Massachusetts BBO No. 559656*
wnystrom@nbparis.com
Jack I. Siegal, Esq.
Massachusetts BBO No. 669173*
jsiegal@nbparis.com
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, Massachusetts  02210
T: (617) 778-9100
F: (617) 778-9110
*Co-counsel for Plaintiffs*

\*  *Pro hac vice* applications to be filed