# EXHIBIT 4

# STROOCK

December 13, 2018

Cristina B. Rodriguez
Direct Dial: 305.789.9354
Fax: 305.789.9302
cbrodriguez@stroock.com

***VIA FEDERAL EXPRESS***

Michael Paris, Esq.
Nystrom Beckman & Paris LLP
One Marine Park Drive, 15th Floor
Boston, MA 02210

Re:      Production of Documents by TD Bank, N.A. – Adams, et al

Dear Mr. Paris:

Our firm represents certain insurers (the "**Insurers**") in connection with a coverage dispute brought by TD Bank, N.A. ("**TD Bank**"), styled *TD Bank, N.A. v. Lloyd's Underwriters, et al.*, which is currently pending in the Ontario Superior Court of Justice, Case No. 2016 ONSC 4188 (the "**Canadian Litigation**"). Through the Canadian Litigation TD Bank seeks coverage for claims related to actions filed against TD Bank (and/or its subsidiaries) as a result of the Rothstein Ponzi scheme. One such action involves your client, Amy Adams, case styled ***Adams, et al v. TD Bank NA, et al***, Case No. 11-61688-CIV-COHN/Snow, in the United States District Court for the Southern District of Florida (the "**Rothstein Litigation**").

We understand that as part of the Rothstein Litigation, your client produced documents to TD Bank pursuant to a protective order dated May 2, 2012 (the "**Protective Order**"). A copy of the Protective Order is attached as **Exhibit A**. TD Bank remains in possession of those documents, some of which have been marked "Confidential" under the Protective Oder. In the Canadian Litigation, TD Bank has asserted that it cannot produce these documents to the Insurers because of the Protective Order.

Among other things, the Protective Order, which survived final disposition of the Rothstein Litigation, prohibits TD Bank from producing documents marked confidential to anyone other than "Qualified Persons" as that phrase is defined in Paragraph 5 of the Protective Order. Notwithstanding this restriction, the Protective Order allows the parties to agree between themselves to a modification of or exception to the Protective Order and/or to seek an order of the Court modifying the Protective Order. Ex. A ¶¶14, 20 & 32.

The court in the Canadian Litigation has directed TD Bank to either (1) seek written consent to the production of those documents from the producing party, i.e. your client, or (2)

Michael Paris, Esq.
December 13, 2018
Page 2

seek modification of the Protective Order from the relevant court allowing TD Bank to produce the documents for purposes of the Canadian Litigation. A copy of the June 28, 2016 Canadian order is attached to this letter as **Exhibit B**.

Accordingly, on or about March 17, 2017, TD Bank sent you a letter asking for your client's consent to produce documents to the Insurers. It is our understanding that TD Bank did not receive a response from your client. If our understanding is incorrect, please email a copy of your clients' executed consent form to cbrodriguez@stroock.com.

If your client did not provide a consent, we ask that you and your client take this opportunity to consider doing so and, if your client is amenable, please execute the consent attached as **Exhibit C** and return it to our offices within fourteen (14) days from the date of this letter. The Insurers will protect the confidentiality of the documents and will use the documents only in connection with the Canadian Litigation and not for any other purpose.

If we do not receive your client's consent, the Insurers intend to seek relief by filing a motion to intervene in the Rothstein Litigation for the sole and exclusive purpose of modifying the Protective Order and will advise the Court of your client's lack of consent.

I look forward to hearing from you. Feel free to contact me with any questions or concerns.

Regards,

Cristina B. Rodriguez

Enclosures

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**CASE NO.** 11-61688-CIV-COHN/Snow

AMY ADAMS, et al.

     Plaintiffs,

v.

SCOTT W. ROTHSTEIN,
TD BANK, N.A., and
GIBRALTAR PRIVATE BANK
AND TRUST COMPANY,

     Defendants.
_____/

## AGREED CONFIDENTIALITY AND PROTECTIVE ORDER

The Court, upon the agreed motion of the Plaintiffs and Defendants TD Bank, N.A. and

Gibraltar Private Bank and Trust Company (collectively, the "Parties"), hereby finds that certain

information, documents and things subject to discovery in this action may be claimed to be or to

contain confidential information (as further defined below), including but not limited to personal,

business, technical, financial, and/or non-public commercial information. To expedite discovery

and permit the Parties to proceed without delay occasioned by disputes regarding claims of

confidentiality, the Court hereby enters this Protective Order.

IT IS HEREBY ORDERED:

1. "Confidential Information" shall mean any information which legally may be

protected by order of this Court that constitutes, reflects, or discloses sensitive or confidential

business records, data, financial information, or any other sensitive information, including but

not limited to customer information; information which is deemed confidential by any Party or is

otherwise not to be disclosed under any statute, rule, regulation, or other restriction imposed by law, by any governmental agency, or by any other legal authority; trade secrets; non-public business, sensitive or confidential commercial information; confidential research; development, proprietary or financial information or analyses produced in this proceeding; confidential regulatory information; and/or other confidential information, including but not limited to information protected by constitutional, statutory or other rights of privacy. The interest in confidentiality which renders information "Confidential Information" may belong to a Party or to a non-party in this litigation. "Confidential Information" includes, but is not limited to, all copies, abstracts, excerpts, analyses, or other writings or documents (including but not limited to electronically stored information) that contain, reflect, or disclose such Confidential Information.

2. All Confidential Information exchanged in the course of this litigation shall be used solely for the purpose of preparation and trial of this litigation, and for no other purpose. Confidential Information shall not be disclosed to any person except in accordance with the terms of this Order.

3. For purposes of this Order, "Confidential Information" includes but is not limited to any document, tangible thing, in paper or electronic form, transcript of oral testimony or recorded statement of counsel designated by a party or other supplier as "CONFIDENTIAL" and which may include a party's confidential matter, including but not limited to personal business, technical, financial, and/or non-public information. By way of example, and not limitation, Confidential Information may include or be included in documents, transcripts, answers to interrogatories and other responses to discovery requests, pleadings, briefs, summaries, notes, abstracts, motions, drawings and any instrument which comprises, embodies or summarizes

2

matter which is confidential and which the party desires not to be made public. A party will only designate information as "CONFIDENTIAL" which it in good faith believes contains Confidential Information. Documents and information designated "CONFIDENTIAL" shall be disclosed only to "Qualified Persons" as defined in Paragraph 5, including Sub-Paragraphs (a) through (h), below.

4. Confidential Information comprising particularly sensitive personal proprietary, business or financial information of a party may be designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY," consistent with the procedures of Paragraphs 5 - 21 hereof. Documents and information designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY" shall be disclosed only to attorneys of record identified in Paragraph 5(a), to experts or consultants identified in Paragraph 5(b), to staff of the Court identified in Paragraph 5(c), and to court reporters identified in Paragraph 5(d). Additionally, where a party perceives a need to disclose Confidential Information designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" to persons not encompassed in one of the foregoing categories of persons specifically permitted to receive such information, that party may request in writing the permission of the producing party to disclose such information to such person or persons on a document by document basis. Upon receipt of such a request, the producing party shall, in writing and within five (5) business days of the request, grant or deny permission to disclose, or may limit or otherwise designate the information to be disclosed, the manner of such disclosure, and the treatment (e.g., copying, receipt of materials, etc.) to be accorded the disclosure.

5. "Qualified Persons" means:

(a) Attorneys of record, attorneys supervising or working under the direction

3

of an attorney of record who are not in-house counsel of a Party, and regular employees of such attorneys of record to whom it is necessary that the information be shown for purposes of this litigation;

(b)     Actual or potential experts or consultants, who are not regularly employed by a party and who have signed a document in the form of Exhibit A attached hereto (such signed document will be retained by the party who has designated the expert or consultant and copies of the signed document will be provided to the other parties upon request, except that copies of Exhibit A signed by non-testifying experts will be provided to the requesting party only upon a showing of good cause by the requesting party as determined by the Court);

(c)     The staff of the Court;

(d)     Court reporters and their staff who are required to transcribe testimony containing Confidential Information;

(e)     The Parties themselves, corporate officers and key employees of the Parties who have responsibility for directing or assisting litigation counsel in the preparation and trial of this action;

(f)     Witnesses to whom documents designated CONFIDENTIAL (or Confidential Information contained therein) are disclosed in connection with preparation for deposition or other testimony, but only to the extent counsel making the disclosure believes in good faith that the disclosure is necessary in connection with such preparation;

(g)     Witnesses to whom documents designated CONFIDENTIAL (or Confidential Information contained therein) are disclosed during deposition or other testimony, but only to the extent counsel making the disclosure believes in good faith that the disclosure is

4

necessary in connection with such testimony; and

(h)     If this Court so elects, any other person may be designated as a Qualified Person by Order of this Court, after all parties have been given notice and an opportunity to be heard.

6.     To designate documents produced in this action as having Confidential Information, each party designating a document as confidential ("designating party") shall mark each page of such documents with:  "CONFIDENTIAL (name of designating party)," "CONFIDENTIAL – ATTORNEYS' EYES ONLY (name of designating party)," or other like designation for documents disclosed prior to the entry of this Protective Order, which shall be governed by the terms and conditions of this Order.  In lieu of marking the original of a document, if the original is not produced the designating party may mark the copies that are produced or exchanged.

7.     Claims of confidentiality as to documents made available to a party for inspection and copying pursuant to the local rules of this Court may be made either before such documents are made available for inspection and copying, or after designation for copying by the inspecting party but prior to production of the requested copy.

8.     (a)     Information disclosed at the deposition of any party or one of its present or former officers, directors, employees, or agents, or experts retained by counsel for any party for purposes of this litigation, may be designated as Confidential Information by indicating on the record at the deposition that the testimony is subject to the provisions of this Protective Order.  In the event such a statement is made, all persons attending the deposition who are not Qualified Persons permitted to view such Confidential Information other than the deponent will be excused

5

from the deposition for each portion thereof that is Confidential Information. To the extent possible, the Court Reporter shall consecutively number each page of the entire transcript and then segregate into separate binders the Confidential Information.

(b) Any document or thing designated as CONFIDENTIAL or CONFIDENTIAL – ATTORNEYS' EYES ONLY which is marked as an exhibit during a deposition, if retained by the reporter for inclusion with deposition transcript, shall also be segregated into separate binders.

(c) A party may also designate Confidential Information disclosed at such a deposition by notifying the other parties, in writing, within ten (10) business days after receipt of the transcript, of the specific pages and lines of the transcript which should be treated as Confidential Information. Each party shall attach a copy of such written Notice(s) to the face of the transcript and each copy thereof in its possession, custody or control. Each transcript of a deposition taken of any party, its present or former officers, directors, employees, or agents, or of experts retained by counsel for any party for purposes of this litigation shall be treated as Confidential Information for a period of ten (10) business days after receipt of the transcript. No person or party shall incur any liability hereunder with respect to any information produced in this litigation by a party without a CONFIDENTIAL marking, unless and until the receiving person or party shall have received written notice that such information has been designated Confidential Information marked CONFIDENTIAL or CONFIDENTIAL – ATTORNEYS' EYES ONLY.

(d) Notwithstanding anything to the contrary in this Protective Order, any deponent may review the transcript of his own deposition at any time.

6

9.     A party receiving Confidential Information from any other party shall not make it available to persons other than those individuals identified in Paragraph 5, inclusive of Sub-Paragraphs (a) through (h), and shall limit disclosure to Qualified Persons, except that with respect to a document designated as containing Confidential Information, any person indicated on the face of the document to be its originator, author or recipient of a copy thereof may be shown the document.

10.     Persons who are not Qualified Persons under this Protective Order may be interviewed or examined by any party concerning all Confidential Information of which such persons have prior knowledge.  Furthermore, persons who are not Qualified Persons under this Protective Order may be interviewed or examined as witnesses at depositions and trial concerning all Confidential Information of which such persons have prior knowledge.

11.     Confidential Information produced by any party to any other party shall be maintained at the offices of the recipient's attorney(s) of record.  Copies of Confidential Information may be maintained in the offices of appropriate Qualified Persons only to the extent that such appropriate Qualified Persons require the copies to perform their work in this action. Each party making copies of Confidential Information shall ensure that each copy bears the "CONFIDENTIALITY" designations provided copies of Confidential Information may be made, or exhibits prepared, by independent printers or illustrators for the purposes of this litigation after such printers or illustrators have executed a document in the form of Exhibit A.

12.     A party shall not be obligated to challenge the propriety of a designation of Confidential Information at the time the designation is made, and a failure to do so shall not preclude a subsequent challenge to the designation.  In the event that a party challenges at any

7

stage of this proceeding a designation of Confidential Information, the parties shall first try to resolve such a challenge in good faith on an informal basis. If a resolution cannot be reached, the party challenging the Confidential Information designation shall send a written notice to the designating party identifying with particularity the challenged Confidential Information, stating the reasons why the Confidential Information designation is being challenged and stating that the party will within five (5) business days move the Court to remove the designated status of Confidential Information. The designating party bears the burden of establishing the need for the designated status of Confidential Information. Until such time as the challenge is resolved, such Confidential Information shall be maintained in accordance with this Protective Order.

13.   (a)   A   party   may   use   CONFIDENTIAL   or   CONFIDENTIAL   - ATTORNEYS' EYES ONLY information in any affidavits, briefs, memoranda of law, deposition transcript or other document filed in this action in accordance with S.D. Fla. Local Rule 5.4 and such documents shall be filed in a sealed envelope clearly marked as "sealed document" on the outside with the title of this action and a statement substantially in the following form:

SUBJECT TO PROTECTIVE ORDER

> This envelope (or container) which is filed in this action by (name of party and, if applicable, the name of deponent) is not to be opened nor its contents displayed, copied or revealed except by Court Order.

(b)   The Clerk's office shall treat such CONFIDENTIAL or CONFIDENTIAL - ATTORNEYS' EYES ONLY information as filed in camera, subject to the Court's ruling on the motion to seal to be filed contemporaneously with the envelope marked "sealed document"

8

pursuant to Local Rule 5.4. Where CONFIDENTIAL or CONFIDENTIAL - ATTORNEYS' EYES ONLY information is a severable portion of a document, e.g., interrogatories, deposition transcripts, test reports, lines of a legal memorandum, etc., the portion containing CONFIDENTIAL or CONFIDENTIAL - ATTORNEYS' EYES ONLY information should, where practicable, be filed and served separately from the rest of such document in accordance with the Procedures for Filings Under Seal as stated in S.D. Fla. Local Rule 5.4.

(c)     This shall not prevent a second copy of any pleading or paper, specifically intended for review by the Court, from being forwarded to the Court under seal for consideration by the Court.

14.     Within sixty (60) days after the conclusion of this litigation, whether by settlement, judgment or final appeal, documents designated as Confidential Information and copies of such document shall be returned to the designating party except as this Court may otherwise order or to the extent such information was used as evidence at the trial. As far as the provisions of this Protective Order restrict the communication and use of Confidential Information, this Protective Order shall continue to be binding after the conclusion of this litigation except (a) that there shall be no restriction of exhibits used in Court (unless such exhibits were admitted under seal), and (b) that a party may seek written permission from the producing party or Order of the Court with respect to dissolution or modification of this Protective Order.

15.     This Order shall not restrict any attorney of record in this action from rendering legal advice to his or her client with respect to this action and, in the course thereof, generally referring to or relying upon his examination of Confidential Information. In rendering such

9

advice, and in otherwise communicating with his or her client, the attorney shall not disclose the specific content of any Confidential Information or its source to his or her client unless otherwise permitted to disclose such Confidential Information to such person pursuant to this Order.

16.     Any party designating an expert or consultant as a Qualified Person under Paragraph 5(b) shall have the duty to reasonably ensure that such person observes the terms of this Protective Order.

17.     Nothing contained in this Order shall be deemed a waiver of any requirements for a showing of good cause under the Court rules or of any right of the conveying party to seek an order from the Court regarding further conditions for any inspection of its property, documents and/or premises.

18.     Notwithstanding the foregoing provisions, this Order shall be without prejudice to the right of any party to challenge the propriety of discovery on grounds of privilege, relevance, materiality, etc., and nothing contained herein shall be construed as a waiver of any objection which might be raised as to the admissibility at trial of any evidentiary material.

19.     A failure of any party to expressly challenge a claim of confidentiality shall not be deemed an admission that the same is in fact confidential.

20.     This Order shall not prevent any of the parties from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing between themselves to modification of this Order, subject to the approval of the Court.

21.     An inspecting party or person asserting that the Confidential Information was possessed prior to disclosure, or was acquired or developed independently, and therefore not subject to this Order, shall have the burden of establishing the validity of its position.

10

22.      Absent written modification hereof by the parties hereto or further order of the Court, the provisions of this Order that restrict the disclosure and use of Confidential Information shall survive the final disposition of this Action and continue to be binding on all persons subject to the terms of this Order and the Court shall retain continuing jurisdiction to enforce this Order.

23.      This Order shall be binding on the parties hereto when signed regardless of when the Court enters this Order. If the Court refuses to sign and enter this Order, the parties shall amend, in writing, this Order in accordance with the Court's decision.

24.      The parties and any other person subject to the terms of this Order agree that this Court has jurisdiction over such person or party, for the purposes of enforcing this Order. In the event that any Confidential Information is disclosed by a receiving party in violation of this Order, the Confidential Information shall not lose its status through such disclosure, and the parties shall take all steps reasonably required to assure its continued confidentiality. Nothing herein shall limit or restrict the aggrieved party from seeking remedies or relief from any actual or threatened violation of this Order.

25.      (a)      Any inadvertent disclosure or production of documents in paper or electronic form containing Confidential Information or privileged information will not constitute a waiver of either any available privilege or protection by the disclosing party.

(b)      In the event that the receiving party discovers that it has received documents containing Confidential Information or privileged information, it will bring that fact to the attention of the producing party immediately upon discovery.

(c)      Upon the request of the producing party, the receiving party will promptly return to the producing party any documents containing Confidential Information or privileged

11

information and any copies that the receiving party may have made.

(d)     No such inadvertently produced documents containing Confidential Information or privileged information may be used in evidence against the producing party other than as may be permitted under the terms of this Order for information so designated.

26.     The parties agree to produce documents in this action in electronic format to the extent possible.  The preferred electronic format for each party shall be provided to each of the other parties in advance of any document production.

27.     Production in electronic format also requires providing a requesting party with appropriate load files or their equivalent associated with the electronic documents being provided.

28.     The parties may, but need not, produce electronic documents by publishing them in a downloadable format on a remote website, such as an FTP site, by the date any such production is due.

29.     Nothing in this protective order otherwise prevents the parties from informally agreeing to procedures pertaining to the production of electronic documents in order to promote efficiency and lower the burden of their production.

30.     It is the intent of this Protective Order, and the understanding of the Parties to this case, that any designation of any document or information as CONFIDENTIAL shall not be binding upon nor considered precedent with respect to any deliberations of any court or tribunal in another proceeding considering the confidentiality, discoverability or admissibility of those documents and information in that proceeding nor shall documents produced as CONFIDENTIAL in this case be produced or used in another matter.

12

31.    This Protective Order does not constitute an agreement to produce any documents, including but not limited to documents which a Party is prohibited from producing by law or regulation, and the definitions of Confidential Information set forth herein and the terms of this Protective Order do not constitute a waiver of any objection a Party has or may have to the production or use of documents and information, and each of the Parties reserves all such rights, privileges and objections.

32.    The parties hereto may by stipulation provide for exceptions to this Protective Order and any party or subpoenaed third party supplier of Confidential Information in this litigation may seek an order of this Court modifying or interpreting this Protective Order.

33.    None of the foregoing provisions of this Protective Order shall be deemed to preclude any party hereto from seeking and obtaining, on an appropriate showing, additional protection with respect to the Protective Order or relief from this Protective Order with respect to matter designated as "CONFIDENTIAL – ATTORNEY'S EYES ONLY" or "CONFIDENTIAL."

DONE AND ORDERED this 2nd day of May, 2012, at Fort Lauderdale, Florida.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record

## EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

### CASE NO. 11-cv-61688-JIC/LSS

AMY ADAMS, et al.

      Plaintiffs,

v.

SCOTT W. ROTHSTEIN,
TD BANK, N.A., and
GIBRALTAR PRIVATE BANK
AND TRUST COMPANY,

      Defendants.

_____/

AFFIDAVIT AND AGREEMENT OF:

_____

STATE OF          )
                    )
COUNTY OF     )

    I, _____, being duly sworn, state that:

1.    My address is _____.

2.    I have received a copy of the Protective Order in this action (the "Order") and I have read the same. Counsel for _____ has explained to me my obligations under the Order.

3.    I will comply with all of the provisions of the Order.

4.    I will hold in confidence, will not disclose to anyone not qualified under the Order, and will use only for purposes of this action, any confidential information which is disclosed to me.

14

5.      I will return all confidential information which comes into my possession, and all notes, documents or things which I prepare relating thereto, to counsel for the party by whom I am employed or retained.

6.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of this Affidavit and Agreement pursuant to the Order.

_____
Affiant

SUBSCRIBED AND SWORN TO before me this ____ day of _____, 2012.

_____
Print Name: _____
Notary Public

My commission expires:

15

# EXHIBIT B

CITATION: TD Bank, N.A. v. Lloyd's Underwriters, 2016 ONSC 4188
COURT FILE NO.: CV-14-495750
DATE: 20160628

**SUPERIOR COURT OF JUSTICE - ONTARIO**

RE:        TD BANK, N.A., Plaintiff

**AND:**

LLOYD'S UNDERWRITERS" THAT SUBSCRIBE TO POLICY NUMBER
MMF/1710, PRIMARY LONDON REFERENCE NUMBER B0509QA025509
AND EXCESS LONDON REFERENCE NUMBERS QA025609, QA025709,
QA025809, AND QA025909, ANTARES UNDERWRITING LIMITED FOR
ITSELF AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE
1274 (AUL)FOR THE OPERATING YEAR OF 2009, CATLIN SYNDICATE
LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF LLOYD'S
SYNDICATE 2003 (SJC) FOR THE OPERATING YEAR OF 2009, NOVAE
CORPORATE UNDERWRITING LIMITED AND/OR NOVAE SYNDICATES
LIMITED FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF
LLOYD'S SYNDICATE 2007 (NVA)FOR THE OPERATING YEAR OF 2009,
ACE CAPITAL LIMITED, AVE CAPITAL IV LIMITED, AND ACE CAPITAL
V LIMITED FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF
LLOYD'S SYNDICATE 2488 (AGM) FOR THE OPERATING YEAR OF 2009,
BRIT UW LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF
LLOYD'S SYNDICATE 2987 (BRIT) FOR THE OPERATING YEAR OF 2009,
CHAUCER CORPORATE CAPITAL (NO. 3) LIMITED, CHAUCER
CORPORATE CAPITAL (NO. 2) LIMITED, AND/OR IRONSHORE
CORPORATE CAPUTAL LTD. FOR THEMSELVES AND ON BEHALF OF
ALL MEMBERS OF LLOYD'S SYNDICATE 4000 (PEM) FOR THE
OPERATING YEAR OF 2009, ASPEN INSURANCE UK LIMITED, GREAT
LAKES REINSURANCE (UK) PLC, LEXINGTON INSURANCE COMPANY,
AIG INSURANCE COMPANY OF CANADA (FORMERLY KNOWN AS AIG
COMMERCIAL INSURANCE COMPANY OF CANADA), AIG
COMMERCIAL INSURANCE COMPANY OF CANADA, CHARTIS EXCESS
LIMITED (FORMERLY KNOWN AS AIG EXCESS LIABILITY INSURANCE
INTERNATIONAL LIMITED), ALLIED WORLD ASSURANCE COMPANY
LTD., ARCH INSURANCE COMPANY, AXIS SPECIALTY INSURANCE
COMPANY, AXIS SPECIALTY LIMITED, CHUBB INSURANCE
COMPANY OF CANADA, HOUSTON CASUALTY COMPANY, LIBERTY
MUTUAL INSURANCE COMPANY, MARKEL BERMUDA LIMITED
(FORMERLY KNOWN AS MAX BERMUDA LTD.) AND OR MAX
BERMUDA LTD., XL INSURANCE COMPANY PLC (FORMERLY KNOWN
AS XL INSURANCE COMPANY LIMITED) AND OR XL INSURANCE
COMPANY LIMITED and ENDURANCE SPECIALTY INSURANCE LTD.,
Defendants

- Page 2 -

BEFORE:   S. F. Dunphy, J.

COUNSEL:   *W. G. Scott, H. Afarian and S. C. D'Souza*, for the Plaintiff

*G. Luftspring and S. Sasso*, for the Defendants Underwriters and Axis

*J. Halfnight and A. Juntunen*, for the Defendant Liberty Mutual Insurance

*P. Green and D. Vaillancourt*, for the Defendant AIG

*C. Reain*, for the Defendant ARCH Insurance

*G. Gill*, for the Defendant Allied World

HEARD:   June 7, 2016

## ENDORSEMENT

[1]   This is a motion brought by the defendants seeking to compel the plaintiff to include in its (yet to be delivered) affidavit of documents three categories of documents that the plaintiff claims it cannot produce by reason of various prohibitions existing under United States law. The claim is before me as case management judge and in the context of an insurance claim brought by the plaintiff Toronto-Dominion Bank arising from operations of a subsidiary in the United States.

[2]   For the reasons that follow and in the particular circumstances of this case, I find that the foreign (US) laws in question in fact prohibit the plaintiff from producing and, in some cases, from disclosing even the existence of the documents in question. The plaintiff is subject to and not the beneficiary of the laws in question. It can neither waive the laws nor consent to production of the documents. This court will not lightly require parties to violate foreign laws where these have been found to merit the respect and assistance of this court. It is common ground that avenues exist for the defendants to seek leave or third-party consent for the production of some or all of the documents in question. I am directing the plaintiff to provide reasonable co-operation and assistance in facilitating the identification and production of the documents in question should the defendants chose to seek leave or consent of the relevant authorities and shall request the aid and assistance of the relevant United States court in doing so.

### Factual overview

[3]   A Florida subsidiary of TD was found to have become implicated in a Ponzi scheme perpetrated on a number of investors in Florida by a name-partner of a now-bankrupt law firm ("Rothstein"). The Rothstein firm was a client of TD's subsidiary. A former employee of that subsidiary (Mr. Spinosa) was alleged to have knowingly aided and assisted Rothstein in the carrying out of the fraud. The TD employee pleaded guilty to some but not all charges made against him as part of a plea bargain. He was given a term in jail. The law firm became

- Page 3 -

bankrupt and the name-partner who was the mastermind of the scheme has been given an exceptionally long sentence as a guest of a local penal institution to consider whether crime pays.

[4]     The fraud was also the object of investigations by two United States regulators supervising TD's operations – the Office of the Comptroller of the Currency (or "OCC") and the Financial Crimes Enforcement Network (or "FinCEN"). These investigations also resulted in adverse findings against TD.

[5]     While the penal and administrative/regulatory consequences of the scheme were swiftly attended to, the civil aspects took somewhat longer.

[6]     A number of the defrauded investors sued TD and claimed that it was vicariously liable for Mr. Spinosa's role in the scheme. TD notified its fidelity insurers (the defendants in this case) but they declined to undertake TD's defence. The first such civil case to get to trial (*Coquina Investments v. TD Bank et al.*) resulted in a jury verdict in favour of the plaintiff investor which verdict included a substantial award of punitive damages. After an unsuccessful appeal, TD found it more advisable to settle the remaining civil claims rather than run the risk of still further adverse jury verdicts.

[7]     All told, TD spent almost $500 million (including costs) to resolve its potential exposure under the various civil actions brought by the investors. TD commenced this action in 2015 against its insurers under its fidelity policy. The insurers have initially denied coverage also challenge the reasonableness of the settlements reached. TD is claiming the right to recover $300 million of its loss under the relevant policies having regard to claims limits and the applicable deductible.

[8]     This action is still at an early stage. Neither side has produced an affidavit of documents. At my direction, the parties have begun exchanging documents and having their clerks collaborate in formulating an electronic discovery plan to maximize litigation and trial efficiency despite a number of issues pertaining to the finalization of the affidavit of documents that have been identified as requiring resolution. TD has delivered approximately 20,000 documents thus far and there will be many, many more to be delivered regardless of the outcome of this motion.

[9]     In the process of preparing its affidavit of documents, TD advised the defendants that it would not be able to produce the following categories of potentially relevant documents:

      a.  "Regulatory Investigation Documents" (documents provided to or received from OCC or FinCEN in connection with their investigation of the Ponzi scheme in question);

      b.  "Unredacted Banking Documents" (documents from its client – the now-bankrupt law firm – revealing full transaction details including names and account numbers of third parties transacting with TD's client law firm that are protected by state and Federal privacy laws); and

- Page 4 -

c.   "Protected Documents" (documents marked "confidential" that were produced on discovery by plaintiffs in the settled civil suits against TD that are subject to various Protective Orders issued by the relevant US court).

[10]   The defendants accept that TD is in fact prohibited by United States (Federal or state) law or by the Protective Orders from producing documents in these three categories (subject to some minor caveats and nuances). They also accept that there are avenues available either to the defendants or TD to seek consent or leave from the relevant authorities to produce the documents for purposes of this litigation.

[11]   The defendants take the position that TD, having chosen to bring this case in Ontario, has the same obligation of all litigants in this jurisdiction to produce an affidavit of documents listing all documents relevant to any matter in issue over which it has power, possession or control, whether or not a privilege is claimed: Rule 30.02(1) of the *Rules of Civil Procedure*. If, as and when TD is able to demonstrate that it has been unable to obtain permission of the relevant court or authority in the US to produce the documents, this court may then consider whether the circumstances then-existing warrant relieving TD of its obligation to produce the documents. It follows, they suggest, that TD should be required to turn over every stone and make every reasonable effort to remove the legal impediments in the United States to the production or identification of these documents and should seek relief from this court only as and when they have been rebuffed.

[12]   TD for its part suggests that its production obligations are not nearly as absolute or harsh as suggested. Our courts have a long history of extending comity to courts in the United States. The documents in question came into TD's possession in the course of carrying on business in the United States and while subject to its laws. The impediments to producing the documents under United States law are broadly similar to a number of prohibitions existing under Canadian law. The documents requested are not in the power of TD being in the United States and subject to the legal requirements of that jurisdiction. The defendants have avenues available to them if they seek production and TD has offered to extend reasonable co-operation to assist them in obtaining consent or leave as the case may be. There is no evidence that TD is in a better position than the defendants nor, given the means of the parties and the stakes of this litigation, is cost of the process a real objection. TD objects to the suggestion that it must make applications itself for documents sought by the defendants while a sword of Damocles is suspended over its head suggesting that if its efforts are not judged satisfactory by the defendants it might be held to account and run the risk of sanctions in Ontario simply for obeying US laws that the insurers knew or ought to have known it was subject to when insuring those same US operations of TD.

[13]   For the reasons that follow, I have decided to cut the Gordian knot and adopt a simple but pragmatic approach. It matters little whether TD is excused from producing the documents because they are deemed not in TD's power or control by reason of US law affecting them or whether by reason of those same laws and the application of principles of comity TD should be excused from producing them. The outcome is the same. I can see no cause to harness TD to the wheel and compel them to perform feats before US regulators or courts under vague threat of future sanctions if its performance is not judged by the defendants to have been adequate in

- Page 5 -

hindsight.  There is no evidence TD is better situate to obtain production of the documents free of US law than the defendants who actually seek the documents and desire their production.

[14]    I have fashioned an order designed to permit the defendants to obtain what they seek, but requiring them to take the initiative of doing so (with some narrow exceptions).

### Issues to be decided

[15]    This motion raises the question of what recognition ought this court to extend to prohibitions against the production of the admittedly relevant documents under foreign law.

### Analysis and discussion

[16]    The defendants were by and large willing to concede that the legal impediments under US law raised by TD were serious and real and the consequences of ignoring them would be quite serious as well.  Their own expert evidence suggested some possible exceptions might be available here or there, but accepted that in the main, the pleaded legal impediments were both serious and real.  While arising under foreign law, they are of a quite familiar sort since our own jurisdiction imposes largely similar restrictions in similar circumstances.

[17]    In light of this, the defendants were required to concede that there is vanishingly little chance that I could be persuaded to order TD to breach US law that it is quite ordinarily and validly subject to.  Comity is a value that runs deep on both sides of our border and is the product of a very long, peaceful and cooperative history and common legal culture.  The US is by no means the only jurisdiction to whom we ordinarily extend comity, but it can perhaps be considered to occupy a pre-eminent ranking in the list.

[18]    Our courts have always sought means of accommodating the reasonable requirements of foreign law in matters pertaining to the production of documents in litigation.  They do so whether by way of recognizing statutory privileges under foreign law or by way of extending comity.  I am persuaded by the sentiments expressed by Brooke J.A. in *Frischke et al. v. Royal Bank of Canada et al.*, (1977) 17 O.R. (2d) 388 where he found (at para. 26):

> "An Ontario Court would not order a person here to break our laws; we should not make an order that would require someone to compel another person in that person's jurisdiction to break the laws of that State. We respect those laws. The principle is well recognized."

[19]    This case is not at all similar to the situation faced by Master Albert in *McAvan Holdings v. BDO Dunwoody Ltd.*, 2003 CanLII 64222 (ON SC) where the defendant's consent to the production of the documents was all that was wanted to gain access to the documents protected by law (in this instance, Canadian law) from production.  It is common ground in the present case that TD cannot consent to the production of these documents.  Either the consent of the relevant regulator, third party or court is required and TD has no power to compel such consent or leave to be provided.  TD has only the power to ask – something the defendants are equally well situated to do.

- Page 6 -

[20]    For reasons that I have yet to fathom, the real dispute between the parties appeared to come down to who, as between the plaintiff and the defendants, should actually make the relevant applications to determine whether the legal prohibitions under US law can be lifted or relaxed. If the foreign law prohibition is bona fide and of a sort that ought to attract comity from this court, this court ought not to hold a plaintiff who is subject to that valid prohibition as a sort of hostage bound to seek waivers of that law in the absence of compelling evidence that the plaintiff has some material advantage in seeking the documents compared to the defendants. If the prohibition is deserving of comity, comity should be extended without adding a price tag to be paid by the plaintiff who is merely caught in the middle of a legal conflict it did not create.

[21]    I shall turn now to a consideration of each of the three categories of documents and my more detailed disposition of each.

       (a)    Regulatory Investigation Documents

[22]    In connection with reporting to its regulators and assisting in their investigations of the Rothstein Ponzi scheme, TD sent documents to and received documents from both OCC and FinCEN.

[23]    TD's expert, Ms. Hernandez, provided a report describing the sources and extent of the privileges attached to communications with these two regulators.

[24]    In relation to the OCC, Ms. Hernandez' option provides:

> "There is a specific and strict communication privilege that exists between banks and their respective federal banking regulator, such as the OCC, TD Bank's primary federal regulator.   This communication privilege, known as the "supervisory privilege" prohibits the disclosure of regulatory documents, including Reports of Examination, correspondence with regulators and other non-public supervisory information regarding a financial institution".

[25]    FinCEN receives "Suspicious Activity Reports" from regulated financial institutions including TD. FinCEN considers the SAR's themselves *and even the fact that a SAR was filed* to be confidential information that may not be publicly disclosed. Unauthorized disclosure of a SAR or any information concerning a SAR is punishable by civil and criminal penalties.

[26]    At least some of the friction between the parties and their respective experts on this issue appeared to me to be the result of miscommunication. The defendants feared that TD was claiming that documents that were not otherwise privileged from production in this litigation somehow *acquired* privilege solely by virtue of having also been produced to OCC or FinCEN. That fear appeared to me to be entirely misplaced and TD readily agreed. Documents created or recorded for some other purpose but that were also provided to OCC or FinCEN are producible (although the actual communication of those documents to the regulators is not). While there may well be minor disputes around the margins, the well-known "dominant purpose" test would appear to me to be a very serviceable litmus test for determining whether a document was created for the purpose of being given to the regulators or for some other purpose and then

- Page 7 -

subsequently disclosed to the regulators. If the dominant purpose underlying the creation of a particular document was to report to the regulators, its production ought to be conditioned by that dominant purpose.

[27]    Both expert reports concur that routes exist for either TD or the defendants to seek consent of these regulators to the production of some or all of the information that TD is otherwise prohibited from disclosing.

[28]    The regulatory privilege claimed in this case is neither of a type nor breadth that is unknown in our domestic law. The *Securities Act*, RSO 1990, s. S.5 s. 13, the Regulations under the *Insurance Companies Act*, SC 1991, c 47, the *Office of the Superintendent of Financial Institutions Act*, RSC 1985, c 18, s. 39.1 all may be referred to for similar restrictions.

[29]    The details of these and other statutes are of course not identical, but their essential goals are similar. Fostering the necessary degree of open dialogue between regulated institutions and regulators is to be protected and encouraged by the creation of broad zones of confidentiality. The privilege is not absolute and grounds may exist in certain cases to disregard it. However, it would seem clear that the jurisdiction that has created the privilege and foreseen a mechanism to seek departures from it is better situate to judge when and in what circumstances the policy in favour of confidentiality ought to cede to the policy in favour of affording litigants full access to documents needed to establish their case or rebut the case made against them.

[30]    There is nothing in the evidence before me to suggest that TD has any kind of advantage in seeking consent to the production of this category of documents for the purposes of this litigation.    The claimed privilege is one that satisfies the Wigmore test for assessing communications worthy of protection applied by the Supreme Court of Canada in *Slavutych v. Baker et al.*, [1976] 1 SCR 254, 1975 CanLII 5 (SCC). The communications originated in confidence, the maintenance of that confidence is necessary, the relation is one that ought to be fostered having regard to our own similar mosaic of laws and the injury that would ensue from disclosure outweighs the benefit. In the case of the latter criteria, there is no reason to expect the privileged regulatory exchanges would communicate *facts* not able to be obtained from other sources. Admissions made in confidence to regulators may prove beyond reach, but the facts needed to justify them can be obtained by other means.

[31]    In my view, the regulatory privileges created under the relevant US laws in favour of communications with OCC and FinCEN ought to be recognized and afforded comity in the circumstances of this case and the avenues for obtaining exceptions to or waivers of the privilege available under those same laws are best situate to weigh the competing interests.

[32]    I can see no basis to require TD to bear the initiative of bringing applications to seek consent for production before these regulators, particularly where I have no reason to assume TD's application will be successful or more successful than an application brought by the defendants. I am not prepared to order production of this category of documents. I reserve the right to require TD to provide reasonable assistance to the defendants in processing any applications they may be minded to bring and in that connection the defendants ought to be entitled to proceed with the benefit of a request from this court for aid and assistance if need be.

- Page 8 -

    (b)    Unredacted Banking Documents

[33]    TD's Florida banking subsidiary is subject to both Federal and State law that protect the privacy of certain banking documents. As argument progressed, the gaps between the positions of the parties appeared to narrow.

[34]    TD's customer in this case was a law firm that is now bankrupt. The account information of the Rothstein firm – including transaction records - has already been made public in a redacted format as part of the bankruptcy proceedings. TD does not object to producing the redacted account information of its own customer since this is already public. What the defendants are seeking is the *unredacted* version of those public documents that will reveal the identity and account numbers of *all* parties transferring funds into the law firm's accounts and the identity of parties receiving funds transferred out. Funds electronically transferred in or out of the accounts would generate an electronic trail indicating the name of the sending or receiving financial institution, the name of the account holder and the holder's own account information. All of this data is subject to privacy laws not unlike our own.

[35]    The defendants are unable at this point offer more than speculation as to what relevance much of this information will have. Some of the information will be duplicative of the next category of documents (documents produced by the defrauded investors in support of their now-settled claims against TD). Other transactions will reflect ordinary course transactions of parties dealing with the law firm that is quite unrelated to the fraud. The defendants claim they are handicapped by not knowing what they don't know. Without more, they will be unable to undertake any kind of forensic analysis of the accounts although precisely what forensic analysis they intend to undertake and to what purpose is not yet clear.

[36]    The expert evidence of both sides concurred that the relevant Federal regulation is the "*Gramm-Leach-Bliley Act*" and "*Regulation P*" that prohibits a financial institution from disclosing a consumer's non-public personal information to a non-affiliated third party except in limited circumstances. While the defendants suggest that few of the transactions in the law firm account at TD will involve "consumers" as defined in the *Gramm-Leach-Bliley Act*, TD counters that this cannot be determined in advance. The consequences of breach of the statute are potentially grave.

[37]    Florida law also protects the privacy of banking information and, unlike its Federal counterpart, is not restricted to consumers. Florida's *Privacy Law* (Fla. Stat. Section 655.059) restricts the disclosure of a financial institutions books and records including customer information and imposes criminal sanctions for violations of it. It is not clear under Florida law whether an Ontario court would be considered a "court of competent jurisdiction" that could compel production notwithstanding the *Privacy Law*.

[38]    I am satisfied based upon the expert evidence provided to me that these two statutes prohibit TD from producing the Unredacted Banking Documents without running a serious risk of criminal sanctions.

- Page 9 -

[39]    The defendants' expert suggested that there may be arguments available to TD to support the possible grounds for producing some of the Unredacted Banking Documents. An Ontario court order *might* provide justification under US law. Or it might not. It cannot yet be said how a Florida court would consider the matter.

[40]    In my view, this is a case where the privacy interests protected by Florida and US law ought to be accommodated as far as reasonably practicable. The following factors, among others, appear to me to be influential ones:

>   a. The fact that the policy of the two foreign laws in question is analogous to similar policies finding expression in our own law[1] even if the expression of that policy is not in all respects identical;
>
>   b. The fact that Florida and the United States have the closest and most real connection with the creation and custody of the documents and the privacy interests being protected belong to parties who are largely if not exclusively resident there as well; and
>
>   c. The fact that the insurance policy that is the subject-matter of this action was issued by insurers who voluntarily chose to extend coverage to the operations of an insured in the jurisdiction where the documents they now seek were created and stored.

[41]    The penalty for violating either statute is potentially very severe and the risk is by no means imagined or fanciful. This court is not in the habit of ordering litigants to breach foreign law. Whether I conclude that the documents are beyond the power or TD to produce by reason of the legal impediments or whether I exercise my discretion to grant comity to the foreign rules and relieve TD from its obligations to list and produce these documents would appear to me to be a distinction without a difference.

[42]    In my view, the preferred course of action in this case is (i) to recognize that TD is prohibited by Florida and US law from producing the redacted information from the transaction records of its customer; (iii) to recognize that such privacy laws are entitled to comity from this court; and (iii) to grant the defendants an order seeking the aid and assistance of the courts of the United States to secure the production of the unredacted information. Such an order *may* take the form of an order directed to TD to produce the information provided that the order is conditional upon such order being recognized by a court of competent jurisdiction in the United States which the defendants shall be at liberty to seek. I leave it to the parties to seek advice from the experts as to how best to formulate the request.

[43]    I find that the privacy interests of parties engaging in what may well be entirely un-related transactions with TD's Florida customer is an interest deserving to be recognized and

---

[1] See for example *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5.

fostered having regard to the Wigmore criteria. TD is justified in not violating US law to produce the documents of such uncertain value in Canada. A US court will be better situate than this court to weigh the potential harm of disclosure against the as-yet uncertain benefits to the litigation process of production. The confidentiality of the documents in these circumstances ought to be respected subject to the discretion of the relevant US court to consent to their production. I can see no reason in such a case to hold TD hostage to obtain the consent of US courts over which it has no control. The initiative to seek consent to the production of the documents ought to be borne by the defendants seeking them.

[44] I leave it to the parties to work out the form of order and request best suited to facilitate the defendant's application to gain access to the redacted information after seeking appropriate US legal advice including restrictions, if any, on the use of the documents in Canada.

### c. Protected Documents

[45] The deemed undertaking rule that protects documents produced in the course of discovery from being used for other purposes is contained in Rule 30.1 of the *Rules of Civil Procedure*. In many jurisdictions in the United States, a similar result is obtained, but following a process of crafting disclosure orders on a case-by-case basis. While the orders are customized somewhat, they follow a broadly similar template.

[46] In general terms, where the producing party has designated a particular document or class of document as "confidential", the Protective Orders under which TD obtained possession of these documents offers only two routes by which the documents may be produced: (i) TD may seek the consent of the producing party or (ii) the court issuing the Protective Order may amend or vary its order to permit production.

[47] I can see little reason to treat Protected Documents any differently from the Unredacted Banking Documents or the Regulatory Investigation Documents. If this court will be slow to require TD to violate applicable Federal and State banking laws in order to accommodate the discovery requests of the defendants in the circumstances of this case, it will not be any swifter in requiring TD to breach the Protective Orders.

[48] In a perfect world, TD would have destroyed these documents soon after the litigation that caused them to be produced was settled. They were not. TD is, in effect, the accidental custodian of documents belonging to litigants who produced them under compulsion (and subject to the protection) of the Protective Orders and legal process.

[49] I am persuaded by the reasoning of Masuhara J., in the case of *Bryar Law Corporation v. Samsung Electronics Co. Ltd.*, 2010 BCSC 1661 (CanLII) where he expressed what was in my view appropriate reluctance to "grant discovery in contravention of a Protective Order from the California court. As a matter of respect, courts should refrain from interfering with the orders of courts in other jurisdictions" (at para. 47).

[50] The case of *Vitapharm Canada Ltd. v. F. Hoffman-LaRoche Ltd.*, 2001 CanLII 28239 (ON SC); affirmed sub nom. *Ford v. Hoffmann-La Roche Ltd.*, 2003 CanLII 30349 (ON CA) is

- Page 11 -

also instructive. In *Vitapharm*, it was the plaintiffs who were seeking to obtain access to discovery documents produced in US litigation from the defendants. The plaintiffs had brought motions to vary the US Protective Orders before the judge who had made them. The moving party defendants sought an order from the Ontario court restraining the plaintiffs from seeking those documents in the United States. The case was thus, to an extent, the mirror of this one. Cumming J. declined to interfere with the efforts of the plaintiffs in the US and his order was affirmed by the Court of Appeal.

[51]    In my view, the Protective Orders are entitled to comity from this court. The defendants are free to follow the example of the plaintiffs in *Vitapharm* and apply to obtain production in the manner prescribed by the Protective Orders. It is my understanding that the defendants have copies of the relevant Protective Orders. These should be produced if they do not.

[52]    If and to the extent an order of this court or the co-operation of the plaintiff becomes necessary or desirable to pursue an application for production of the documents through the relevant United States court, the defendants may apply for an order on evidence of what is required and why.

[53]    While I would generally be of the view that the initiative ought to be taken by the defendants seeking access to documents belonging to third parties covered by the Protective Orders, it seems to me to be reasonable to require TD to request the consent of the relevant US litigants before requiring the defendants to bring application in the United States. Such a comparatively simple step may well bear fruit. Some or all of the litigants in the US may prefer to negotiate terms under which the documents are produced or they may be satisfied with the provisions of our deemed undertaking pursuant to Rule 30.1 of the *Rules of Civil Procedure* once informed of it. I cannot assume they will be obdurate for the sake of it nor can I presume to know what reasonable objections they may have.

[54]    Accordingly, I direct:

> i.   The plaintiff shall provide copies of all relevant Protective Orders to the defendants;
>
> ii.  The plaintiff shall send a letter (in form reasonably satisfactory to the defendants) requesting litigants whose documents they possess through one or more Protective Orders requesting their consent to the production of such documents to the defendants in this litigation; and
>
> iii. The defendants shall be authorized to bring such motions to vary the Protective Orders before the courts that issued them to obtain production of the Protected Documents as they wish.

## Disposition

[55]    Given the customized nature of my order in respect of each separate category of documents, this is one case where it seems most appropriate to provide "Order Accordingly" and

- Page 12 -

leave the parties some space to work out the precise terms of one or more orders best suited to accomplish the objectives expressed in these reasons.

[56]    While TD has been largely successful on this motion, I am of the view that it is most appropriate to award costs in the cause in this instance. This is a large and complex case. There will doubtless be a number of issues arising that the parties will need assistance on. To their credit, they have shown a fairly high level of civility and cooperation in developing this case thus far. I am disinclined in a case such as this to issue a number of what could only be (in the scale of this case at least) nuisance costs awards that will simply create distractions and minor annoyance where motions have been reasonably brought and conducted. Such awards will neither incent better behaviour from the parties than I am able to monitor and secure as case management judge nor would they materially advance the principle of indemnity. If either side is of the view that a particular motion is deserving of different treatment as regards costs, they are of course invited to signal that position to me in their written or oral argument.

S.F. Dunphy, J.

Date: June 28, 2016

# EXHIBIT C

## CONSENT

## TO DISCLOSURE OF DOCUMENTS SUBJECT TO A PROTECTIVE ORDER

I hereby authorize on behalf of **Amy Adam et al** the disclosure and production of documents subject to a protective order in the United States District Court in the Southern District of Florida, **Case No. 11-61688-CIV-COHN/Snow** to the Defendant Insurers in the Canadian insurance coverage lawsuit.

By: _____

Date: _____

Michael Paris, Esq.
Nystrom Beckman & Paris LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210

I have authority to bind **Amy Adam et al**.

DOCS 16475421